# Exhibit A

## IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE

**KROGER LIMITED PARTNERSHIP I,**

    Plaintiff,

v.

Civil Case No. *C H - 11 - 1683 -)*

**INLAND WESTERN MEMPHIS
WINCHESTER, LLC, and
AMERICAN HOME ASSURANCE
COMPANY,**

    Defendants.



---

### COMPLAINT FOR DECLARATORY JUDGMENT,
### BREACH OF CONTRACT, AND BAD FAITH

---

**TO THE HONORABLE CHANCELLORS OF THE CHANCERY COURT FOR
SHELBY COUNTY, TN:**

COMES NOW, the plaintiff, Kroger Limited Partnership I (hereinafter "Kroger"), by and

through its attorneys and the Law Firm of Spicer Rudstrom, PLLC, and pursuant to Tenn. Code

Ann. § 29-14-101, et seq., Tenn. Code Ann. § 56-7-101, et seq., and the common law of the State

of Tennessee, and files this Complaint for Declaratory Judgment, Breach of Contract, and Bad

Faith, against the defendants, Inland Western Memphis Winchester, LLC (hereinafter "Inland"),

and American Home Assurance Company (hereinafter "American Home") (collectively

"defendants"), respectfully stating as follows:

### PARTIES

    1.    Plaintiff, Kroger, is a foreign corporation authorized to do business in the State of

Tennessee, and is organized and existing by virtue of the laws of the State of Ohio, with its

principle place of business in Cincinnati, Ohio.

2.      Inland is a foreign corporation authorized to do business in the State of Tennessee, and is organized and existing by virtue of the laws of the State of Delaware, with its principle place of business in Oak Brook, Illinois. Inland may be served with process in the State of Tennessee, through its registered agent, CT Corporation System, 800 S. Gay St., Suite 2021, Knoxville, TN 37929.

3.      Defendant American Home is a foreign corporation authorized to do business in the State of Tennessee, and is organized and existing by virtue of the laws of the State of New York, with its principle place of business in New York, New York.  American Home may be served with process in the State of Tennessee, through its registered agent, Department of Commerce and Insurance – Commissioner, located at 500 James Robertson Parkway, 5th Floor, Nashville, TN 37243.

## JURISDICTION & VENUE

4.      Jurisdiction is proper pursuant to Tenn. Code Ann. § 29-14-102.

5.      Venue is proper pursuant to Tenn. Code Ann. § 20-4-101.

## FACTS

6.      On or about December 21, 2007, at approximately 8:18 p.m., Ms. Lillian Brooks, went to the Kroger store located at 7942 Winchester Road, in Memphis, Tennessee.  Complaint at ¶ 8, attached hereto as Exhibit A.

7.      On said date at said time, Ms. Brooks, while walking toward the front door of said Kroger store, was struck by a 2003 Dodge pick up truck, driven by Tuwayne Shivers.  Exhibit A at ¶ 8.

8.      On December 5, 2008, Lillian Brooks filed a lawsuit against Kroger, Inland, and

Tuwayne Shivers, (hereinafter "Suit") for injuries she allegedly sustained as a result of being struck by the Dodge truck. See Exhibit A. Said Suit is pending in the Circuit Court of Shelby County, Tennessee, and is styled as *Lillian Brooks and Anthony L. Brooks v. Tuwayne Shivers, The Kroger Company, and Inland Western Memphis Winchester, LLC*, Civil Case No.: CT-005853-08 (Division IV)1.

      9.    The Kroger store located at 7942 Winchester, Memphis, Tennessee, is part of the "Winchester Commons Shopping Center". See Lease Agreement, attached hereto as Exhibit B.

      10.    Kroger rents the real property in which it operates the Winchester store under a Lease Agreement executed on April 28, 1999. Defendant Inland bought the property on November 5, 2004. See Deposition of Brian Quinton Middleton, pp.12, 46, attached hereto as Exhibit C.

      11.    The Lease Agreement refers to the greater real property on Winchester Road as the "Shopping Center" and identifies two sub-parts therein: 1) the "Demised Premises," meaning the storeroom used by Kroger; and 2) the "Common Area," meaning the portions of the property not occupied by a building. Exhibit B, p. 1.

      12.    Under the Lease Agreement Kroger is responsible only for the interior of the Demised Premises, (Ex. B, p. 6), and the "Landlord," in this case Inland, was *alone* responsible for the Common area. (Ex. B, p. 5). More specifically, Inland was "responsible, at its sole cost and expense, for the repair, upkeep, maintenance, security, and replacement … of all portions of the Common Area, including, but not limited to, parking areas and drives, pedestrian walkways, parking lot light standards … [and] signs …" (Ex. B p.5); Deposition of Middleton, pp. 13, 38, 54.

13.    The Lease Agreement at Paragraph 11, further provides:

Landlord further shall maintain general public liability insurance over the Common Area with a combined bodily injury, death and property damage limit of [redacted] or more per occurrence. All insurance maintained in accordance herewith shall contain a waiver of subrogation against Tenant, shall name Tenant as an additional insured by endorsement to Landlord's policy, and shall be carried by an insurer qualified to conduct business in the state in which the Demised Premises are situated and rated 'A+XII' or higher by A.M. Best Company's Key Rating Guide, Property-Casualty. Prior to the date that Rental commences as provided hereunder, and thereafter upon request, Landlord shall furnish Tenant with a certificate of insurance and endorsement to Landlord's policy evidencing the type and amount of coverage set forth in this Paragraph and a provision that there will be no cancellation, reduction or non-renewal without giving Tenant thirty (30) days prior written notice thereof and a certified copy of an endorsement naming Tenant as an additional insured and stating that Landlord's insurance is primary. Notwithstanding anything contained herein to the contrary, *Landlord expressly releases Tenant for any damages to the Demised Premises, the Shopping Center and the Common Area or for any injuries incurred in the Shopping Center or the Common Area, irrespective of cause, which are customarily covered by the insurance required to be maintained in accordance with this Paragraph. By way of explanation, it is the intent of the preceding sentence that Landlord's insurance will answer to all claims for personal injuries or property damage arising from incidents or occurrences in the Common Area.*"

Exhibit B p. 8-9, emphasis added.

14.    The Lease Agreement also provides: "Landlord [Inland] shall indemnify and save harmless Tenant [Kroger] from all claims, losses, damages and expenses, including without limitation reasonable attorneys' fees, arising out of Landlord's failure to maintain the ... Shopping Center in accordance with the Lease or any applicable law." Exhibit B, p. 9).

15.    Kroger did not design, develop, or have any control of any areas exterior to the store itself, including the parking area and driving area. Deposition of Middleton, p. 36, attached hereto as Exhibit C.

---

1 On October 15, 2010, the court entered an Order of Voluntary Non-Suit as to defendant Tuwayne Shivers.

4

16.     It was the owner's decision and/or responsibility, not Kroger's, to erect stop signs within the parking area and/or crosswalks.  Deposition of Middleton, p. 38, attached hereto as Exhibit C.

17.     The subject accident occurred in the parking lot of the Winchester Commons Shopping Center.  Exhibit B at ¶ 8.

18.     The subject accident occurred in the area under the sole control and direction of Inland Western Memphis Winchester, L.L.C., and not of Kroger.

19.     In addition to being entitled to a defense and indemnification under the Lease Agreement, Kroger is listed as an additional insured on Inland's Certificate of Liability Insurance which is an active policy (No.: GL4572271) (hereinafter "the Policy"), and was in full force and effect at the time of this incident.  See Certificate of Liability Insurance, attached hereto as Exhibit D.

20.     As such, Kroger hereby affirmatively pleads and asserts any and all policy provisions, terms definitions, endorsements, coverages and agreements contained within American Home Policy No.: GL4572271, deeming Kroger as an insured, and incorporates the same by reference as though fully copied and set forth herein in words and figures.  Kroger further expressly invokes and asserts all rights, coverages, and other relief available to it or granted to it under the terms of the subject policy.

21.     In light of the above facts, on February 19, 2009, counsel for Kroger sent a letter to counsel for Inland and American Home, tendering the defense of the Suit pursuant to the Lease Agreement. See Correspondence from Rick Rudstrom Esq., to David Feigelson, Esq, dated February 19, 2009, attached hereto as Exhibit E.

5

22.     On February 16, 2011, counsel for Kroger sent another letter to counsel for Inland and American Home explaining that in addition to the indemnity provision in the Lease Agreement, Kroger had been "named as an additional insured on the policy of insurance affecting the property in question..." See Correspondence from Rick Rudstrom Esq., to David Feigelson, Esq, dated February 16, 2011, attached hereto as Exhibit F.  Kroger's counsel also asked counsel for Inland and American Home to provide him "with a certifed copy of the Policy No.: GL4572271, showing Kroger as an additional insured." Id.

23.     In response to Kroger counsel for Kroger's February 16th letter, counsel for Inland and American Home expressly and deliberately denied that Kroger was named as an additional insured on the Policy and refused to provide Kroger with a certified copy of the Policy.  See Correspondence from David Feigelson, Esq. to Rick Rudstrom, Esq., dated February 25, 2011, attached hereto as Exhibit G.

24.     On March 1, 2011, Kroger's counsel responded to defense counsel's February 25th letter, and enclosed the Certificate of Insurance for Inland Western Retail which was effective for a coverage period of October 1, 2007 to December 1, 2008, and which "clearly provides that Kroger Company and its affiliates are to be additional insureds."  Correspondence from Betty Ann Milligan, Esq. to Dave Feigelson, Esq., dated March 1, 2011, attached hereto as Exhibit H. Once again Kroger's counsel asked that Kroger be provided with a certified copy of the Policy, and requested that Inland and American Home assume the defense of Kroger in the Suit. Id.

25.     On June 1, 2011, counsel for Kroger sent yet another letter to counsel for Inland and American Home advising defendants of Kroger's intent to file a Declaratory Judgment action "seeking defense, indemnification, recovery of expenses to Kroger for the defense of this

particular matter, as well as attorney's fees for pursuit of the Declaratory Judgment."
Correspondence from Betty Ann Milligan, Esq. to Dave Feigelson, Esq., dated June 1, 2011,
attached hereto as Exhibit I.

26.     Counsel for Kroger goes on to explain that "[i]t is our position that your clients[']
continued refusal to acknowledge its obligations to the Kroger Company constitutes bad faith.
This bad faith refusal to honor the terms of the contractual agreement between the parties is
totally unacceptable and a clear violation of the applicable law." Id.

27.     To date, neither Inland nor American Home has agreed to assume the defense of
Kroger and, as a result, Kroger has incurred and continues to incur, significant attorneys' fees
and expenses in having to defendant the Suit.  Further, neither company has agreed to be
responsible for any potential judgment rendered against Kroger in the Suit.

28.     Said refusal to assume the defense of Kroger was made in bad faith and without
substantial justification, and such refusal has inflicted additional expense, loss, and/or injury
including attorney fees upon Kroger.  As a result, defendants are in clear violation of Tenn. Code
Ann. § 56-7-105, and should be subjected to the penalties available under the statute.

29.     Kroger requests that this Court declare the rights and legal obligations of the
entities interested under American Home Policy No.: GL4572271.

30.     Kroger requests that this Court also declare the rights and legal obligations of the
entities interested under the Lease Agreement.

31.     A real controversy now exists between Kroger and Inland and American Home as
to whether the policy of insurance issued by American Home to Inland, provides liability

coverage, including a duty to defend and/or indemnify or otherwise represent Kroger in the Suit filed by Lillian Brooks.

32.     A real controversy also exists between Kroger, Inland, and American Home, as to whether the Lease Agreement triggers a duty on the part of Inland and/or American Home to defend and/or indemnify or other wise represent Kroger in the Suit.  A real controversy also exists with respect to whether Inland and/or American Home breached the Lease Agreement between the parties.

33.     Finally, a real controversy also exists between Kroger, Inland, and American Home, as to whether Inland and/or American Home acted in bad faith in their refusal to assume the defense of Kroger in the Suit and/or to agree to indemnify Kroger in the event that a judgment was/is rendered against Kroger.

34.     In order to terminate the controversy and the uncertainty concerning the existence and/or extent of liability coverage, and the existence of any duties owed by Inland and/or American Home to Kroger in the context of the Suit, it is necessary that a declaration be made as to the rights and obligations of Kroger, Inland and American Home, under the Lease Agreement, the Policy, and Tenn. Code Ann. § 56-7-105.

WHEREFORE, THE FOREGOING PREMISES CONSIDERED, Kroger Limited Partnership I, prays that this Honorable Court determine and adjudicate the rights of the parties and declare and decree the following:

(a)     That under the Lease Agreement, Inland and/or American Home have a duty to defend and/or indemnify Kroger with respect to all attorneys' fees, costs, expenses, and/or any judgment arising out of Civil Case No.: CT-005853-08;

8

(b)     That as a result of defendants' unwillingness to accept tender of the defense of the Suit, Inland and/or American Home are in breach of the Lease Agreement;

(c)     That under American Home Policy No.: GL4572271, Inland and/or American Home have a duty and obligation to defend Kroger, in connection with Civil Case No.: CT-005853-08;

(d)     That under American Home Policy No.: GL4572271, Inland and/or American Home have a duty and obligation to pay any sums for liability relating to, pertaining to, or in connection with the allegations in Civil Case No.: CT-005853-08;

(e)     That under American Home Policy No.: GL4572271, Inland and/or American Home have a duty and obligation to pay any and all judgments rendered against Kroger in Civil Case No.: CT-005853-08;

(f)     That under American Home Policy No.: GL4572271, Inland and/or American Home have a duty and obligation to pay any and all agreed settlements entered into by Kroger and the plaintiffs in Civil Case No.: CT-005853-08;

(g)     That under American Home Policy No.: GL4572271, Inland and/or American Home have a duty and obligation to reimburse Kroger, for all attorneys' fees, costs, and expenses incurred in defending Civil Case No.: CT-005853-08;

(h)     That as a direct and proximate result of defendants' unwillingness to accept tender of the defense of the Suit, Inland and/or American Home are in breach of American Home Policy No.: GL4572271;

(i)     That as a direct an proximate result of Inland's and/or American Home's bad faith refusal to assume the defense of Kroger and agree to indemnify Kroger for any potential

9

judgment, Inland and American Home are in violation of Tenn. Code Ann. § 56-7-105 and, as a result, Kroger suffered additional expense, loss, or injury.

(j)     That this Court grant Kroger damages including the costs, expenses and attorneys' fees incurred by Kroger in having to defend the underlying suit, the costs expenses and attorneys' fees incurred by Kroger in having to prosecute this Declaratory Judgment Action, and an additional 25 percent damage award as the "bad faith penalty" pursuant to Tenn. Code Ann. § 56-7-105.

(k)     That this Court grant such additional and further relief to which Kroger may be entitled.

Respectfully submitted,

SPICER RUDSTROM, PLLC

BY _____
BETTY ANN MILLIGAN (TN Bar No.: 11299)
175 Toyota Plaza, Suite 800
Memphis, Tennessee 38103
(901) 523-1333
*Counsel for Plaintiff,*
*Kroger Limited Partnership I*

J:\Data\BAM\42340\Declaratory Judgment Action\Complaint For DJ & Breach Of Contract Doc2.Doc

IN THE CIRCUIT COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

LILLIAN BROOKS and
ANTHONY L. BROOKS,

      Plaintiffs,

vs.                  No.    CT-005835-08



                JURY DEMANDED

TUWAYNE SHIVERS,
THE KROGER COMPANY
A Corporation, and
INLAND WESTERN MEMPHIS
WINCHESTER, LLC,

      Defendants.

## COMPLAINT FOR PERSONAL INJURIES AND LOSS OF CONSORTIUM

     COME NOW, the Plaintiffs, Lillian Brooks and Anthony L. Brooks, by and through undersigned counsel and for their cause of action against Defendants, Tuwayne Shivers, The Kroger Company and Inland Western Memphis Winchester, allege as follows:

### JURISDICTION AND VENUE

    1.    Plaintiff Lillian Brooks ("Brooks") is a resident citizen of Memphis, Shelby County, Tennessee.

    2.    Plaintiff Anthony L. Brooks ("Anthony Brooks") is a resident citizen of Memphis Shelby County, Tennessee. Plaintiff Anthony Brooks is the adult child of Plaintiff Brooks and is wholly dependent upon her for his care, sustenance and wellbeing.

    3.    Defendant Tuwayne Shivers ("Shivers"), upon information and belief, is a resident citizen of Memphis, Shelby County, Tennessee.

ND: 4814-8264-8835, v. 1



4.      Defendant The Kroger Company ("Kroger") is a foreign corporation licensed to do business in Memphis, Shelby County, Tennessee, and can be served with process through its registered agent, Corporation Service Company.

5.      Defendant Inland Western Memphis Winchester, LLC ("Inland") is a foreign limited liability corporation licensed to do business in Memphis, Shelby County, Tennessee, and can be served with process through its registered agent, CT Corporation System.

6.      Venue is appropriate in Shelby County, Tennessee pursuant to T. C. A. § 20-4-101.

### FACTS

7.      At all times material hereto, Plaintiff Brooks was conducting herself in a prudent and cautious manner and was in no way negligent and was free of any comparative negligence.

8.      On or about December 21, 2007 at approximately 8:18 p.m., Plaintiff Brooks was walking toward the front door of the Kroger store located at 7942 Winchester Road, in Memphis, Tennessee, for the purpose of purchasing groceries.  At or about the same time, Defendant Shivers, while operating a 2003 Dodge pickup truck, negligently drove through the parking lot and struck Plaintiff Brooks with his vehicle.

9.      As a result of the above described accident, Plaintiff Brooks suffered severe, painful and permanent injuries as set forth more fully hereinafter.

10.     On December 21, 2007, the Kroger parking lot did not have a crosswalk leading from the parking lot to the store.

11.     On December 21, 2007, the Kroger parking lot did not have sufficient lighting.

12.     On December 21, 2007, the Kroger parking lot did not have stop signs facing incoming and outgoing traffic near the store entrance.

2

ND: 4814-8264-8835, v.  1

13.    On December 21, 2007, the Kroger parking lot did not have speed bumps or any other mechanism to slow traffic at or near the entrance to its store.

## COUNT I – NEGLIGENCE OF TUWAYNE SHIVERS

14.    Plaintiffs allege that the acts of Defendant Shivers proximately caused this accident and that Defendant Shivers was guilty of one or more of the following acts of common law negligence which were the direct and proximate cause of the accident and the Plaintiffs' resulting injuries and damages:

(a)    Defendant Shivers negligently failed to maintain a proper lookout;

(b)    Defendant Shivers negligently failed to maintain proper control of his vehicle;

(c)    Defendant Shivers negligently failed to exercise that degree of care and caution which was reasonable and commensurate with the then existing circumstances;

(d)    Defendant Shivers negligently failed to devote full time and attention to operating his vehicle;

(e)    Defendant Shivers negligently operated his vehicle in a wanton and reckless manner; and

(f)    Defendant Shivers negligently failed to yield the right-of-way.

15.    Plaintiffs allege that Defendant Shivers is guilty of violating one or more of the following Ordinances of Shelby County, each of which was in full force and effect at the time and place of the accident, the violation of which constitutes negligence per se and which is the direct and/or proximate cause of the accident and Plaintiffs' resulting injuries and damages:

(a)    **20-38. Duty to devote full time and attention to operating vehicle.**

It shall be unlawful for a driver of a vehicle to fail to devote full time and attention to operating such vehicle when such failure, under the then existing circumstances, endangers life, limb or property.

3

(b)   20-39. **Duty to drive at safe speed, maintain lookout and keep vehicle under control.**

Notwithstanding any speed limit or zone in effect at the time, or right-of-way rules that may be applicable, every driver shall:

(2)   Maintain a safe lookout.

(3)   Use due care to keep his vehicle under control.

(c)   20-43. **Emerging from or entering alley, private driveway or building.**

The driver of a vehicle entering into a street or highway, either from an alley or from a private road, driveway or building, shall yield the right-of-way...to all vehicles approaching on such street or highway, and it shall be the duty of the driver of every vehicle so entering a street or highway to bring his vehicle to a stop and not enter therein until same may be done with safety and without danger to others using the street or highway, and he shall proceed with caution.

16.   Plaintiffs allege that Defendant Shivers is guilty of violating one or more of the following Ordinances of the City of Memphis, each of which was in full force and effect at the time and place of the accident, the violation of which constitutes negligence per se and which is the direct and/or proximate cause of the accident and Plaintiffs' resulting injuries and damages:

(a)   20-112.   **Duty to devote full time and attention to operating vehicle.**

It shall be unlawful for a driver of a vehicle to fail to devote full time to operating such vehicle when such failure, under the then existing circumstances, endangers life, limb or property.

(b)   20-127.   **Duty to drive at safe speed, maintain lookout and keep vehicle under control.**

Notwithstanding any speed limit or zone in effect at the time, or right-of-way rules that may be applicable, every driver shall:

(2)   Maintain a safe lookout.

(3)   Use due care to keep his vehicle under control.

(c)   20-142.   **Emerging from alley, private driveway or building.**

4

> The driver of a vehicle entering into a street or highway, either from an alley, from a private road or driveway of a building, shall yield the right-of-way...to all vehicles approaching on such street, and it shall be the duty of the driver of every vehicle so entering a street or highway to bring his vehicle to a stop and not enter therein until same may be done with safety and without danger to others using the street, and he shall proceed with caution.

17.    Plaintiffs allege that Defendant Shivers is guilty of violating one or more of the following Statutes of the State of Tennessee, each of which was in full force and effect at the time and place of the accident, the violation of which constitutes negligence per se and which is the direct and/or proximate cause of the accident and Plaintiffs' resulting injuries and damages:

A.    T.C.A. § 55-10-205 - **Reckless driving.**

(a)    Any person who drives any vehicle in willful or wanton disregard for the safety of persons or property commits reckless driving.

18.    Plaintiffs allege that as the direct and proximate result of the foregoing acts of negligence and the violations of the Ordinances of Shelby County, Tennessee, the Ordinances of the City of Memphis, Tennessee and the violations of the Statutes of the State of Tennessee, the Plaintiffs incurred and continue to incur injuries and damages including:

(a)    painful and permanent injuries including, but not limited to broken bones;

(b)    physical pain and mental anguish;

(c)    impaired ability to enjoy the normal pleasures of life;

(d)    a loss of earning capacity;

(e)    medical bills and expenses, past and future; and

(f)    loss of consortium.

## COUNT II - NEGLIGENCE OF KROGER

Plaintiffs incorporate by reference as if fully set forth verbatim each and every allegation in the Complaint.

5

ND: 4814-8264-8835, v. 1

19.     At all times material hereto, Plaintiff Brooks was a business invitee of Defendant Kroger, having the intention to enter the store and purchase grocery items.

20.     Defendant Kroger was negligent in the design of its parking lot or was otherwise negligent in not providing a crosswalk, adequate lighting, stop signs, a mechanism to slow traffic at the store's entrance or maintaining the premises in a safe and prudent manner, as it was foreseeable that a pedestrian would be struck by a vehicle at night in the absence of such precautions, and Defendant Kroger knew or should have known of the danger inherit in such a situation by the exercise of reasonable care.

21.     Defendant Kroger was under a duty to use reasonable diligence and due care to keep its parking area safe for pedestrians who were crossing into its store which it failed to do.

22.     Defendant Kroger, owing a duty to Plaintiff Brooks, was guilty of the following acts of common law negligence which were the direct and proximate causes of the accident and injuries described herein:

(a)     Failure to use ordinary care to maintain the premises in a reasonably safe condition;

(b)     Failure to create, make, or establish a safe method of crossing into and from the store, when Kroger knew or should have known that individuals including Lillian Brooks, depended upon it to provide a means of safe crossing on behalf of its business invitees;

(c)     Failure to remove dangerous conditions when the risk of harm was foreseeable and unreasonable and the conditions caused by the lack of safety precautions had existed for such a length of time that Kroger knew or should have known or discovered the conditions in the exercise of reasonable care; and

(d)     Failure to remove the dangerous conditions which existed where there was a high degree of foreseeability of harm and the gravity of the harm versus the burden placed on Defendant Kroger would have been minimum to protect Lillian Brooks.

ND: 4814-8264-8835, v. 1

## COUNT III - NEGLIGENCE OF INLAND

Plaintiffs incorporate by reference as if fully set forth verbatim each and every allegation in the Complaint.

23.     At all times material hereto, Plaintiff Brooks was a business invitee of the Defendant Inland, having the intention to enter Inland's premises and purchase grocery items.

24.     Defendant Inland was negligent in the design of the parking lot and in failing to provide crosswalks, adequate lighting, stop signs, a mechanism to slow traffic at the store's entrance or otherwise maintain the premises in a safe and prudent manner as it was foreseeable that a pedestrian would be struck by a vehicle at night in the absence of such precautions. Defendant Inland knew or should have known of the danger inherit in such a situation by the exercise of reasonable care.

25.     Defendant Inland was under a duty to use reasonable diligence and due care to keep the parking area of its tenants safe for pedestrians which it failed to do.

26.     Defendant Inland, owing a duty to Plaintiff Brooks, was guilty of the following acts of common law negligence which were the direct and proximate causes of the accident and injuries described herein:

    (a)    Failure to use ordinary care to maintain the premises in a reasonably safe condition;

    (b)    Failure to create, make, or establish a safe method of crossing into and from the store, when Landlord knew or should have known that individuals including Plaintiff Brooks, depended upon it to provide a means of safe crossing on behalf of its business invitees;

    (c)    Failure to remove dangerous conditions when the risk of harm was foreseeable and unreasonable and the conditions caused by the lack of safety precautions had existed for such a length of time that Landlord knew or should have known or discovered the conditions in the exercise of reasonable care; and

ND: 4814-8264-8835, v. 1

(d)     Failure to remove the dangerous conditions which existed where there was a high degree of foreseeability of harm and the gravity of the harm versus the burden placed on Defendant Landlord would have been minimum to protect Plaintiff Brooks.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Brooks prays that judgment be entered against the Defendants in the amount of $1,450,000.00 in compensatory damages. Plaintiff Anthony Brooks prays that judgment be entered against the Defendants in the amount of $100,000.00.  A jury is demanded to try this case.

Respectfully submitted,

GLANKLER BROWN, PLLC

Saul C. Belz (BPR #4346)
Robert B. C. Hale (BPR #13261)
One Commerce Square, Ste. 1700
Memphis, Tennessee  38103
(901) 525-1322
Attorneys for Plaintiffs

NO: 4814-8264-8835. v. 1

8

(CHANCERY/CIRCUIT) COURT OF TENNESSEE
140 ADAMS AVENUE   MEMPHIS, TENNESSEE 38103 RECEIVED
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS STATE OF TENNESSEE

SUMMONS IN CIVIL ACTION

NO. CT-cc5835-c8          AD DAMNUM  $_____          2008 DEC -9 PH 12:19

LILLIAN BROOKS, and                                                    BILLY HASSELL
ANTHONY L. BROOKS,                          Home Address SECRY OF STATE

                                                                    Business Address
vs.          PLAINTIFFS
TUWAYNE SHIVERS,
THE KROGER COMPANY, and                     Home Address
INLAND WESTERN MEMPHIS WINCHESTER, LLC
DEFENDANTS                                  Business Address

TO THE DEFENDANT(S): __The Kroger Company (Serve through Secretary of State)
                      c/o Corporation Service Company, Registered Agent
                      2908 Poston Avenue
                      Nashville, TN 37203

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and

serving a copy of your answer to the Complaint on Saul C. Belz and Robert B. C. Hale          Plaintiffs

attorney, whose address is 1700 One Commerce Square, Memphis, TN 38103 , telephone 525-1322    within

THIRTY (30 ) DAYS after this summons has been served upon you, not including the day of service.  If you fail to do so, a

judgment by default may be taken against you for the relief demanded in the Complaint.

                                            JIMMY MOORE, Clerk
                                            KENNY ARMSTRONG, Clerk & Master

TESTED AND ISSUED___12 /5____ , 20 08    By  _____ , D.C.

                      TO THE DEFENDANT(S):

NOTICE: Pursuant to Chapter 919 of the Public Acts of 1980, you are hereby given the following notice:
Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If
a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under
oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you
thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or
garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed. These
include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain
such apparel, family portraits, the family Bible and school books. Should any of these items be seized, you would have the right to
recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

                              COST BOND

I hereby acknowledge and bind myself for the prosecution of this action and payment of all costs not to exceed $500.00 m
this court which may at any time be adjudged against the plaintiff in the event said plaintiff shall not pay the same.

      Witness My Hand this _____ day of _____ ,20 _____

Certification when applicable
                                            _____
                                                         Surety

I, KENNY ARMSTRONG, Clerk & Master        I, JIMMY MOORE, Clerk of the Circuit
of the Chancery Court, Shelby County,     Court, Shelby County, Tennessee, certify
Tennessee, certify this to be a true and  this to be a true and accurate copy as filed
accurate copy as filed this_____     this __12/5D-08__
KENNY ARMSTRONG, Clerk & Master           JIMMY MOORE, Clerk

By: _____ , D.C.            By: _____ , D.C.

                                                                    Front

## RETURN ON SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I HAVE SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____, 20 ____ at _____ M.

a copy of the summons and a copy of the Complaint to the following defendents

_____

Mark Luttrell, Sheriff

By _____

Deputy Sheriff

### PRIVATE PROCESS SERVER

I HEREBY CERTIFY THAT I HAVE SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____, 20 ___ at _____ M. a copy of the

summons and a copy of the Complaint to the following defendants

_____

### (PLEASE PRINT THE FOLLOWING)

Private Process Server _____        Address _____
                                                   _____

Company _____                   Phone _____

Other manner of service:                           Signature _____

_____

_____

_____

I hereby certify that I have NOT served this Summons on the within named defendant(s) _____

_____

because _____ is / are not to be found in this County for the

following reason(s): _____

Mark Luttrell, Sheriff

This _____ day of _____, 20 ___.    By _____

Deputy Sheriff

NO. CT-cc-5835-11

IN THE
CIRCUIT (CIRCUIT) COURT
OF TENNESSEE
FOR THE THIRTIETH
JUDICIAL DISTRICT AT MEMPHIS

SUMMONS IN CIVIL ACTIONS

Lilliam Brooks and
Anthony L. Brooks
PLAINTIFF

vs.

TuWayne Shivers, The Kroger Co and
Inland Western Memphis Winchester LLC
DEFENDANT

Came to hand

Saul C. Belz
Robert B. C. Hale
Attorney for Plaintiff

Tel. No. (901) 525-1322

Back

V-437 - 04/26/99

## LEASE AGREEMENT

THIS LEASE AGREEMENT dated _28th_ day of _april_, 1999, by and between ORCHID, L.L.C., an Alabama limited liability company, successor in interest to Faison-Winchester Commons Limited Partnership, a North Carolina limited partnership ("Landlord"), and KROGER LIMITED PARTNERSHIP I, an Ohio limited partnership ("Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant have entered into a certain Ground Lease Amendment No. 1 of even date herewith amending the Ground Lease dated December 16, 1997 (the "Ground Lease"), between Tenant and Landlord's predecessor in interest, which Ground Lease Amendment No 1 is entered into for the purpose of redefining the premises unto Tenant under the Ground Lease as the storeroom ("Demised Premises") which is outlined in red on the plot plan ("Plot Plan") attached hereto as Exhibit "A" and made a part hereof and located in the Winchester Commons Shopping Center ("Shopping Center") situated in the City of Memphis, County of Shelby, and State of Tennessee and described more particularly in the above-described Lease; and

WHEREAS, Landlord and Tenant desire to enter into this Lease Agreement in furtherance of the Ground Lease, as amended by Ground Lease Amendment No. 1, which Ground Lease and Lease Agreement are hereinafter collectively referred to as the "Lease".

NOW, THEREFORE, in consideration of Ten Dollars ($10.00), the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1. **CONSTRUCTION**

   A. **DESIGN AND CONSTRUCTION.** Tenant acknowledges that it has constructed the Demised Premises, and Tenant accepts same in the condition in which it now exists in accordance with all applicable laws, rules, ordinances and regulations, state, federal and local, and in substantial accordance with the Plot Plan which shows all buildings as well as driveways, sidewalks, parking spaces and vehicular access points to adjacent roadways situated in the Common Area. The term "Common Area" as used herein shall mean the improved portions of the Shopping Center not occupied by building area as shown on the Plot Plan.

-1-



B.   LANDLORD'S   CONSTRUCTION   AND   ENVIRONMENTAL WARRANTIES.   Landlord warrants (i) that during the term of the Lease the that the Landlord shall maintain the Demised Premises in good condition to the extent required by the provisions of the Lease, (ii) that the Demised Premises and the Shopping Center shall be modified (if necessary) in accordance with all applicable laws, rules, ordinances and regulations, state, federal and local as well as the Requirements and the Plans unless there is a conflict between the Plans and the Requirements, in which event the Plans shall control  and (iii) Landlord knows of no environmental contamination or violation with respect to the Shopping Center in general and the Demised Premises in particular.

C.   HAZARDOUS MATERIALS

(i)   As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety or property and/or the use and/or disposal of which is regulated by any governmental authority, including any hazardous substance or waste as defined by the Resource Conservation and Recovery Act., 42 U.S.C. Sections 6901, et seq., as amended ("RCRA") or the Comprehensive Environmental Response, Compensation and Liability Act., 42 U.S.C. Sections 9601 et seq., as amended ("CERCLA"), and any rules and regulations now or hereafter promulgated under either of such acts or other laws or regulations.  Tenant shall not cause or permit any Hazardous Material to be brought upon, generated, treated, kept or used in or about the Premises by Tenant, its agents, employees, contractors or invitees (provided that this provision shall not prohibit Tenant from using, in the ordinary course of Tenant's business operation, Hazardous Materials in such forms, types, quantities and uses as are permitted under applicable legal requirements, provided that Tenant complies with all such legal requirements, including without limitation any reporting requirements).

(ii)   Landlord shall be responsible for abatement, removal and/or remediation of Hazardous Materials introduced into the Demised Premises or the Shopping Center by Landlord, its agents, contractors or employees or other tenants and occupants of the Shopping Center. In the event that such Hazardous Materials are present in the Demised Premises and such presence is due to Landlord's actions, Landlord shall have the obligation to encapsulate or remove, transport and dispose of such Hazardous Materials in the manner prescribed by applicable federal, state, or local law or regulation, unless and except if the same are not required by law to be abated, encapsulated or disposed of and its presence is not a violation of any law, in which event no action shall be required of Landlord.

-2-

(iii)    During any such abatement, removal and/or remediation procedure by Landlord, Tenant's Rental and all other recurring monthly charges under this Lease shall abate for the period that Tenant is required to be closed for such abatement.

(iv)    Tenant shall be responsible for abatement of Hazardous Materials introduced into the Shopping Center by Tenant or its agents, contractors or employees. In the event that such Hazardous Materials are present in the Shopping Center, Tenant shall have the obligation to encapsulate or remove, transport and dispose of such Hazardous Materials in the manner prescribed by applicable federal, state, or local law or regulation, unless and except if the same are not required by law to be abated, encapsulated or disposed of and its presence is not a violation of any law, in which event no action shall be required of Tenant.

(v)    Tenant shall indemnify and hold Landlord harmless with respect to all liability, loss and expense arising out of the existence of Hazardous Materials introduced into the Shopping Center by Tenant or its agents, contractors or employees. This indemnity shall not apply to liability, loss or expense which arise from the acts or omissions of Landlord, its agents, contractors or employees.

2.    <u>SUBSEQUENT GOVERNMENT REQUIREMENTS.</u>    Landlord shall furnish any apparatus or material and shall perform such work in or about the Demised Premises and the Shopping Center as may be required by any governmental authority, unless such requirements are imposed solely by reason of the particular type of business conducted in the Demised Premises and are not covered by the Plans, and result not from Landlord's or its employees', agents' or contractors errors or omissions, in which case, Tenant shall furnish such apparatus or material and shall perform such work.

3.    <u>RENTAL.</u>    Beginning on May 1, 1999, Tenant shall pay Landlord the sum of Forty Thousand Nine Hundred Eighty and no/100 Dollars ($40,980.00) per month for the primary term of Tenant's occupancy of the Premises payable in advance as rental ("Rental") for the Demised Premises.   Rental for a partial month shall be prorated and adjusted by the parties.

Beginning with the first month of the First Renewal Option, if exercised by Tenant, the Rental will be Forty-one Thousand Eighty-six  and 40/100 Dollars ($41,086.40).

Rental payable by Tenant to Landlord on successive renewal options, if exercised by Tenant, will be as follows:

| | | |
|---|---|---|
| 2nd five year renewal | $41,192.40 | per month |
| 3rd five year renewal | $41,298.40 | per month |
| 4th five year renewal | $41,404.40 | per month |

-3-

| | | |
|---|---|---|
| 5th five year renewal | $41,510.40 | per month |
| 6th five year renewal | $41,616.40 | per month |

4. __PERCENTAGE PAYMENTS.__  Tenant shall pay to Landlord a sum of money ("Percentage Payment") equal to one percent (1%) of gross retail sales ("Sales") in excess of Forty-nine Million, One Hundred Seventy-six Thousand, Four Hundred Thirty and no/100 Dollars ($49,176,430.00) ("Minimum Sales Base") made from the Demised Premises during each Lease year.  The Minimum Sales Base shall be determined by multiplying the Annual Rental times 100.  The actual sales base will be determined by the Annual Rent paid by Tenant to Landlord.  Amounts in excess of the Maximum Percentage Payment shall not accumulate from year to year.  Tenant shall furnish Landlord a report of Sales and shall pay Landlord any Percentage Payment earned in accordance with this Paragraph within ninety (90) days after the expiration of each Lease year.  The term "Sales" as used herein shall exclude:  cash discounts; rebates; refunds; allowances to customers; the exchange of merchandise between the stores of Tenant; discount sales to dentists or physicians; sales, excise or other taxes imposed by any governmental authority; cost of trading stamps; sales of fixtures or equipment; extraordinary sales and those other than in the normal course of business; sales of cigarettes; and sales of beer, wine and other alcoholic beverages.  Receipts earned from:  any banking, financial, insurance or similar commercial enterprises; optical, dental or other professional services; dry cleaning, beauty salons or other non-professional services conducted in the Demised Premises; lottery tickets, money orders or other negotiable instruments; vending machines, arcade games, or leasing of equipment or products; or sales generated from licensed or sublet departments or concessions shall constitute Sales only to the extent that Tenant earns income from same.  The term "Lease year" as used in this Paragraph shall mean a period of twelve successive calendar months, the first of which shall commence on the commencement date of the base term of the Lease, provided that it shall include any time period preceding such date during which Tenant is open for business so long as the Minimum Sales Base shall be increased pro rata for any additional time period, but shall not be decreased should Tenant open for business after such commencement date.  In the event that the Lease continues on a month-to-month basis after the expiration hereof, the Percentage Payment either shall be calculated on an annual basis if the Lease is in effect for a full year or shall be calculated on a monthly basis based on the proration of the Minimum Sales Base corresponding to the time period during which the Lease is in effect. In the event that the Lease so continues on a month-to-month basis after the expiration, the Percentage Payment shall be paid within ninety (90) days after the expiration of each Lease year or the earlier termination of such month-to-month tenancy.

The Percentage Payment shall not constitute Rental, but rather shall be a bonus to Landlord, and shall be payable only in the event of actual Sales made from the Demised Premises in accordance with this Paragraph.  Should Tenant cease to conduct business operations

-4-

in the Demised Premises, irrespective of cause, it shall be relieved from the obligation for any Percentage Payment which might have been due Landlord if Tenant were to continue business operations therein.

Any payments made by Tenant pursuant to Paragraphs 21A, 21B and 21C of this Lease Agreement shall be non-cumulative offsets or credits against any Percentage Payment due in the year in which such payments are made by Tenant.

5.   LANDLORD'S DUTY TO MAINTAIN THE COMMON AREA.   Subject to Tenant's reimbursement obligation under Paragraph 21B of this Lease Agreement, Landlord shall be responsible, at its sole cost and expense, for the repair, upkeep, maintenance, security, and replacement (hereinafter "CAM Obligations") of all portions of the Common Area, including, but not limited to, parking areas and drives, pedestrian walkways, parking lot light standards, sidewalks, ramps, uncovered docks and dock walls, signs (except Tenant's standard pylon and facia signs) and landscaping.  The CAM Obligations shall be performed by Landlord with such diligence and in the same manner as performed in similar first class retail shopping centers in the metropolitan Atlanta area.  Snow, ice and debris removal shall be performed by Landlord with such frequency as is necessary to prevent an accumulation of same.  In the event that Tenant believes, in Tenant's reasonable judgment, that Landlord has failed to perform  any CAM Obligation in the manner and to the standards required herein, it shall be entitled, after giving Landlord and any mortgagee of Landlord of which Tenant has received written notice of its name and address ten (10) days prior written notice, to perform any or all of such CAM Obligations on behalf of Landlord, and to deduct all reasonable, actual costs incurred by reason thereof from Rental, Percentage Payments or other payments due under the Lease.  Should Landlord commence to cure within such ten (10) day period, then Landlord shall have an additional thirty (30) days to perform its CAM Obligations before Tenant may exercise its rights set forth herein, provided Landlord pursues such cure continuously and diligently to completion in Tenant's sole reasonable judgment.  In the event of an emergency threatening injury to persons or property, only such notice as is reasonable under the circumstances (if any) shall be required for Tenant to cure and deduct its costs as set forth above.

6.   A.   LANDLORD'S DUTY TO MAINTAIN THE DEMISED PREMISES.  Subject to Tenant assigning to Landlord all applicable warranties, Landlord shall keep and maintain in good repair, and in the same manner as performed in similar first class retail shopping centers in the metropolitan Memphis area, the exterior and structure of the Demised Premises, including without limitation, roof, support columns, footers, exterior light fixtures, sprinklers, electrical switch gear, and subfloor, and Landlord shall maintain all exterior utility and service lines necessary for the operation of the Demised Premises and Common Area, including without

-5-

limitation all pipes, gauges, pumps, drains and wiring.  In the event that Tenant believes, in Tenant's reasonable judgment, that Landlord has failed to keep the exterior and structure of the Demised Premises and the external lines serving the Demised Premises and the Common Area in the required state of repair, it shall be entitled, after giving Landlord and any mortgagee of which Tenant has received written notice of its name and address thirty (30) days prior written notice, to perform such work on behalf of Landlord and to deduct any reasonable, actual costs incurred by reason thereof from Rental, Percentage Payments or other payments due under the Lease. Should Landlord commence to cure within such thirty (30) day period, then Landlord shall have an additional ninety (90) days or if such cure is not capable of completion within such time frame such additional time as is reasonably necessary to perform its exterior, structural, and exterior line maintenance obligations before Tenant may exercise its rights set forth herein, provided Landlord commences such cure within such thirty (30) day period and continuously and diligently pursues such cure to completion, in Tenant's sole reasonable judgment.  In the event of an emergency threatening injury to persons or property, no notice shall be required for Tenant to cure and deduct its costs as set forth above.

B.   ACCESS BY LANDLORD.  During the term of the Lease, Landlord and its management agent and their employees and representatives may   inspect the Demised Premises at such reasonable times provided such persons do not unreasonably interfere with Tenant's operations. At any time during the ninety (90) days immediately preceding the expiration of the Lease, or at any time after Tenant is held to be in default of the Lease and the Lease is terminated, Landlord and Landlord's management agent shall have the right to show the Demised Premises and all parts thereof to prospective tenants between the hours of 9:00 A.M. and 9:00 P.M. on any day except days on which Tenant is closed for business.

C.   TENANT'S DUTY TO MAINTAIN THE DEMISED PREMISES.  Tenant shall keep and maintain those portions of the interior of the Demised Premises not required to be maintained by Landlord pursuant to Paragraph 6A or elsewhere under the Lease in good repair and keep the interior clean and free of debris, and shall keep and maintain all heating, ventilation and air conditioning equipment and water heaters ("Equipment") in the Demised Premises, all subject to ordinary wear and tear, fire or other casualty.  Tenant further shall keep and maintain in good repair all entrance and exit doors, plate glass and exterior signage on the Demised Premises, subject to ordinary wear and tear, fire or other casualty.  Landlord shall reimburse Tenant no later than sixty (60) days prior to the termination or cancellation of the Lease for the cost incurred by Tenant in the replacement of any single item of Equipment or component thereof, less depreciation, provided Tenant shall obtain Landlord's consent to any single item of Equipment costing in excess of $10,000, such consent not be unreasonably withheld or delayed. If Landlord does not consent to such a repair, Tenant will not be obligated to replace such item of

Equipment and may continue to repair such item until the end of the Lease term. For the purpose of this Paragraph, Equipment shall be depreciated over a ten (10) year amortization period. Landlord shall be entitled to inspect the condition of the Demised Premises and repair any obligations that are the responsibility of the Landlord at any reasonable time.

7.   TENANT'S RIGHT TO ALTER THE DEMISED PREMISES.   Tenant shall be entitled to alter or make such interior non-structural additions to the Demised Premises as Tenant may determine so long as such alterations or additions are in compliance with all applicable laws. Tenant shall indemnify and save harmless Landlord from any claim for payment or lien arising out of the alterations of or additions to the Demised Premises made by Tenant, and Tenant shall bond or otherwise remove any lien filed against the Demised Premises in connection with such alterations or additions.   Tenant shall also have the right to affix such appurtenances to the exterior of the Demised Premises as it may from time to time deem necessary including but not limited to transmission/receiving devices , subject to Landlord's prior written approval of such alterations or additions and Tenant's plans for same, such approval not to be unreasonably withheld or delayed.

8.   BLOCKAGE AND RENT ABATEMENT.   In the event that pedestrian passage to the Demised Premises or vehicular passage to the Common Area is partially obstructed for more than five (5) consecutive days  Rental shall be reduced based on the proportionate reduction of any sales made from the Demised Premises, except if such obstruction is caused or necessitated by acts of Tenant. In the event that pedestrian passage to the Demised Premises or vehicular passage to the Common Area is completely obstructed, Rental shall abate until such obstruction is removed.

9.   CONDEMNATION.   In the event that any portion of the Demised Premises is taken by condemnation, Tenant shall be entitled to terminate the Lease and thereupon the parties shall be relieved from all further liability under the same.   In the event that any portion of the Common Area or any adjacent road, other than the area outlined on the Plot Plan in green, is taken by condemnation and Tenant determines that the Demised Premises are untenantable or unusable as a result of such taking, Tenant shall be entitled to terminate the Lease and thereupon the parties shall be relieved from all further liability under the same.  If Tenant fails  to terminate the Lease in accordance with this Paragraph, Rental shall be reduced by the proportionate amount of building area, in the case of Demised Premises, or land, in the case of Common Area, other than the area outlined in green on the Plot Plan, taken by condemnation, or the proportionate reduction of any sales made from the Demised Premises, whichever is greater.  Landlord, in such an event, shall restore forthwith the premises taken or affected by the condemnation to provide the same approximate location, size and configuration of building area as well as all parking lot

light standards, parking spaces, sidewalks, driveways and vehicular access points to adjacent roadways existing prior to the condemnation.  During the time period of such restoration if Tenant is not able to operate in the Demised Premises in Tenant's reasonable judgment, Rental shall abate. In the event that either of the Shopping Center pylon signs situated in the Shopping Center shown on the Plot Plan is taken by condemnation, Landlord shall restore forthwith such sign to a location in the Shopping Center reasonably satisfactory to Tenant.  Nothing herein shall constitute waiver of compensation for damages by reason of a condemnation.  The term "condemnation" as used in the Lease shall include all conveyances in anticipation or lieu of an actual taking.  In the event that the Lease shall be terminated as provided above, all unearned Rental and other payments paid in advance shall be immediately refunded to Tenant.

Notwithstanding anything to the contrary in the Lease, in the event of a condemnation of the Demised Premises, and if in connection with such condemnation Tenant is not permitted to institute a separate suit to recover any loss occasioned by such condemnation, then Tenant shall be entitled to claim and prove in any condemnation or related proceedings brought by Landlord or the condemning authority, and to receive pursuant to such proceedings, such award as may be allowed as damages for Tenant's relocation costs, loss of business, the unamortized portion of betterments and improvements amortized over the original term of the Lease, trade fixtures and other equipment installed by Tenant and not removed.

10.  UNDERLINE{CASUALTY}.  In the event that any portion of the Demised Premises is damaged by reason of fire, casualty or other cause, or is declared unfit or unsafe for use by any governmental authority, Landlord shall restore forthwith the Demised Premises, and Rental shall abate during the time period of such restoration in proportion to the area of the Demised Premises that is untenantable in Tenant's reasonable judgment.  If the time period required to restore the Demised Premises is in excess of two hundred seventy (270) days, Tenant shall be entitled to terminate the Lease.  In the event that any portion of the Common Area is damaged for any reason other than the misconduct of Tenant, its contractor or employees, Landlord shall restore forthwith same.  The Rental during the time period of restoration shall be reduced based on the proportionate amount of land in the Common Area damaged thereby or the proportionate reduction of any sales made from the Demised Premises, whichever is greater. In the event that the Lease shall be terminated as provided above, all unearned Rental and other payments paid in advance shall be immediately refunded to Tenant.

11.  UNDERLINE{LANDLORD'S INSURANCE OBLIGATION}.  Landlord shall maintain an all-risk insurance policy insuring the Demised Premises, excluding foundation and footing, and the Common Area at their full replacement value.  Landlord further shall maintain general public liability insurance over the Common Area with a combined bodily injury, death and property

-8-

damage limit of $2,000,000.00 or more per occurrence. All insurance maintained in accordance herewith shall contain a waiver of subrogation against Tenant, shall name Tenant as an additional insured by endorsement to Landlord's policy, and shall be carried by an insurer qualified to conduct business in the state in which the Demised Premises are situated and rated "A+XII" or higher by A.M. Best Company's Key Rating Guide, Property-Casualty. Prior to the date that Rental commences as provided hereunder, and thereafter upon request, Landlord shall furnish Tenant with a certificate of insurance and endorsement to Landlord's policy evidencing the type and amount of coverage set forth in this Paragraph and a provision that there will be no cancellation, reduction or non-renewal without giving Tenant thirty (30) days prior written notice thereof and a certified copy of an endorsement naming Tenant as an additional insured and stating that Landlord's insurance is primary. Notwithstanding anything contained herein to the contrary, Landlord expressly releases Tenant for any damages to the Demised Premises, the Shopping Center and the Common Area or for any injuries incurred in the Shopping Center or the Common Area, irrespective of cause, which are customarily covered by the insurance required to be maintained in accordance with this Paragraph. By way of explanation, it is the intent of the preceding sentence that Landlord's insurance will answer to all claims for personal injuries or property damage arising from incidents or occurrences in the Common Area. Tenant hereby expressly releases Landlord for any damage or injuries within the interior of the Demised Premises irrespective of cause, including but not limited to all claims for personal injury, unless caused by Landlord's breach of its obligations under the Lease or its willful misconduct.

## 12. LANDLORD'S AND TENANT'S RECIPROCAL INDEMNIFICATIONS.

A.   Tenant shall indemnify and save harmless Landlord from all claims, losses, damages and expenses, including without limitation reasonable attorneys' fees, arising out of (i) Tenant's failure to maintain the Demised Premises in accordance with Paragraph 6C hereof , or (ii) Tenant's use or occupancy of the interior of the Demised Premises.

B.   Landlord shall indemnify and save harmless Tenant from all claims, losses, damages and expenses, including without limitation reasonable attorneys' fees, arising out of Landlord's failure to maintain the Demised Premises and the Shopping Center in accordance with the Lease or any applicable laws.

## 13. USE OF THE DEMISED PREMISES.   Subject to the provisions of this Paragraph, Tenant shall be entitled to use the Demised Premises for any lawful purpose. Nothing herein shall require Tenant to conduct a business in the Demised Premises, or to restrict or affect the time period during which it may conduct a business in the same. Tenant shall be entitled to use the sidewalks abutting the Demised Premises and portions of the Common Area for the storage

-9-

of bascarts, the operation of vending machines and the sale of seasonal merchandise. Additionally, Tenant shall be entitled to use that portion of the Common Area outlined in yellow on the Plot Plan for the sale of seasonal merchandise and special promotions.

Tenant covenants and agrees as follows:

(a) Tenant will comply, at its cost and expense, with all laws, rules, regulations, orders and ordinances of applicable federal, state and local governmental authorities with respect to Tenant's particular use of the Demised Premises, or any work to be performed in the Demised Premises by Tenant pursuant to the Lease, and Tenant shall secure and keep in force all permits, licenses and approvals required for Tenant's particular use of the Demised Premises;

(b) Tenant shall not use any portion of the Demised Premises for a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors except as is incidental to the retail operations conducted in the Demised Premises; is a public or private nuisance; emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness; or creates unusual fire, explosive or other hazards;

(c) Tenant shall not use any portion of the Demised Premises for any of the following uses: funeral parlor; flea market, government-surplus store, salvage store, or auction house; industrial manufacturing, assembly, refining, smelting, agricultural, mining, distilling or warehousing operation (except incident to a retail operation); automobile, truck, trailer or recreational-vehicle sale, leasing, display or repair facility; discotheque; skating rink; any establishment selling or exhibiting obscene materials or pornographic materials; massage parlor; so called head shop; a carnival, amusement park or circus, amusement arcade or game room except as an incidental part Tenant's business in the Demised Premises; body and fender shop; car wash; off-track betting parlor; mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance); dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located in the rear of any building or refuse or recycling efforts incidental to Tenant's retail operations; central laundry, dry cleaning plant, or Laundromat; and living quarters, sleeping apartments, or lodging rooms.

Landlord also covenants and agrees that it shall not allow any portion of the Shopping Center to be used for the businesses or uses set forth in Paragraphs 13(b) and 13(c) above.

The provisions this Paragraph 13 shall apply to any assignee of this Lease and to any subtenant of the Demised Premises.

-10-

14. <u>SUBLETTING AND ASSIGNMENT</u>.   Tenant shall be entitled to assign, mortgage or otherwise pledge the Lease, make a partial assignment of its rights under the Lease, or sublease the Demised Premises, and Landlord expressly consents to same. Tenant shall furnish Landlord notice of any such assignment, mortgage or pledge ("Mortgage") or sublease, including the name and address of any assignee, secured creditor ("Mortgagee") under a Mortgage or subtenant respectively. For purposes of the Lease, the term "Mortgagee" shall only relate to Tenant's Mortgagee.

15. <u>CESSATION OF BUSINESS</u>.

In the event that Tenant, for a continuous period of ninety (90) days, elects voluntarily and permanently to cease all business operations within the Demised Premises and has not sublet or licensed the Demised Premises or assigned the Lease within this period of time, then Landlord shall be entitled to terminate the Lease strictly in accordance with the terms set forth below:

a.   Landlord must give to Tenant written notice of Landlord's election to terminate the Lease within sixty (60) days after all business operations within the Demised Premises have ceased for a continuous period of ninety (90) days. In the event that Landlord fails to give such notice within said sixty (60) day period, all of Landlord's rights under this Paragraph 15 thereafter shall terminate. Rental and other expenses due under the Lease shall abate during such sixty (60) day period.

b.   Upon giving such written notice to Tenant, and as a condition precedent to termination, Landlord shall reimburse to Tenant fifty percent (50%) of the unamortized value of Tenant's leasehold improvements made to the Demised Premises, as reflected in Tenant's books and records (plus, if elected by Tenant and remaining in the Demised Premises, fifty percent (50%) of the unamortized value of Tenant's trade fixtures and equipment, as reflected in Tenant's books and records).

c.   After receipt of Landlord's termination notice, Tenant shall have sixty (60) days occupancy of the Demised Premises, free from all Rental and other monetary obligations, within which to remove its property from the Demised Premises. After such sixty (60) day time period has elapsed, and subject to Landlord's performance of all obligations set forth herein, the Lease shall terminate, and Landlord and Tenant shall have no further obligations under the Lease.

-11-

d.    Notwithstanding anything to the contrary contained herein, Landlord shall have no right to terminate the Lease if Tenant ceases business operations due to casualty, force majeure, labor disputes, strikes, product shortages or other causes outside  of the reasonable control of Tenant.

e.    Notwithstanding anything to the contrary contained herein, the provisions of this Paragraph 15 shall at all times be junior, subordinate and subject to a Mortgage and the rights of Mortgagee thereunder.

16.   LANDLORD'S ASSIGNMENT .  Landlord shall have the unrestricted right to assign this Lease and upon any such assignment and assumption by Landlord's assignee, Landlord shall automatically be released from all further liability under the Lease from and after the date of such assignment and assumption of Lease.  Landlord shall furnish promptly to Tenant a copy of such assignment and assumption of Lease.

17 .  ADDITIONAL  LANDLORD  WARRANTIES  AND  COVENANTS OF  QUIET ENJOYMENT.  Landlord warrants that to the best of Landlord's actual knowledge (i) there is no lawsuit, claim, condemnation, judgment, order or ruling threatened or pending against the Shopping Center as of this date, (ii) all real estate taxes and assessments levied (and currently owed) against the Shopping Center shall be fully paid prior to any penalty or delinquency, (iii) it has the lawful right, title and authority to make the Lease, (iv) Tenant shall quietly and peacefully enjoy the Demised Premises and Common Area, together with all rights, privileges and appurtenances thereunto appertaining, free and clear of any hindrance or molestation subject to the provisions of the Lease and (v) Landlord owns fee simple title to the Shopping Center, free and clear of all liens, easements, restrictions and other encumbrances.  In the event that Landlord breaches any of the warranties set forth herein, Tenant shall be entitled to terminate the Lease in addition to all remedies available at law or in equity.

18 .  A.    TENANT'S DEFAULT.  In the event that Tenant is in default of the Lease and such default continues for thirty (30) days or such longer period if such default cannot be readily cured within such time period so long as Tenant commences such cure within the thirty (30) day period and continuously and diligently prosecutes such cure to completion after its receipt of prior written notice, except for monetary defaults which notice shall be ten (10) days, Landlord shall be entitled to terminate the Lease and repossess the Demised Premises in addition to all remedies available at law or in equity, except as otherwise provided in this Paragraph 18. Notwithstanding anything contained herein to the contrary, for reasons other than the failure to pay Rental or other charges except if Tenant withholds Rental under a reasonable belief such a withholding is permitted under the Lease, Tenant shall not be deemed in default of the Lease

-12-

unless found by a court of competent jurisdiction, or of last resort in the event of an appeal, to have breached the terms of the Lease.

B.   NOTICE TO TENANT'S MORTGAGEE AND MORTGAGEE'S RIGHT TO CURE.  If Tenant continues to be in default of the Lease upon expiration of the thirty (30) day (or longer) grace period provided herein( ten (10) days for monetary default), Landlord shall notify the Mortgagee of the default and same shall be entitled to cure the default within thirty (30) days from its receipt of notice.  If the default cannot be cured within such time period by due diligence, Mortgagee shall have a reasonable time period within which to cure same. Notwithstanding anything contained herein to the contrary, Landlord shall not terminate the Lease by reason of Tenant's default without first serving Mortgagee written notice and allowing Mortgagee a reasonable time period within which to cure same, and to foreclose or otherwise acquire Tenant's interest in the Demised Premises.  If a default by Tenant shall be cured, Mortgagee shall not be obligated to continue any foreclosure or possession proceedings which it may have instituted.  Should Mortgagee or any party claiming through Mortgagee succeed to the interest of Tenant hereunder, Landlord shall recognize the party as the Tenant and shall not disturb its use and enjoyment of the Lease, provided that same cure any default by Tenant which may be satisfied by the payment of money and perform all of the obligations of Tenant set forth in the Lease which accrue thereafter.

C.   TENANT'S MORTGAGEE'S RIGHT TO ENTER INTO A NEW LEASE WITH LANDLORD.  In the event that prior to the expiration of the term then in effect, the Lease is terminated for any reason, including without limitation, rejection or disaffirmance in accordance with any law affecting bankruptcy or creditor's rights, Landlord shall furnish Mortgagee prior written notice and a statement of any and all sums which would have been due under the Lease but for its termination.  Mortgagee within sixty (60) days thereafter shall be entitled to enter into a new lease with the Landlord upon the same terms and conditions of the Lease, including any renewal terms, for the remainder of the term which would have been in effect but for the termination of the Lease, provided that Mortgagee pay all sums under the Lease due and payable but unpaid at the time of the Lease's termination and which become due between the dates on which the Lease is terminated and the new lease becomes effective.  The new lease shall have the same priority of title as the Lease.  Landlord shall execute and return to Mortgagee any and all documents, in form and substance satisfactory to Mortgagee, which secure such priority of title within seven (7) days after receipt of same.  Between the dates on which the Lease is terminated and the new lease becomes effective, Landlord shall keep the Demised Premises and Common Area in good repair and shall not alter same without the prior written approval of Mortgagee.

-13-

D.   LANDLORD'S DUTY TO NOTIFY TENANT'S MORTGAGEE.   Landlord shall serve Mortgagee a copy of all default notices under the Lease,  at the address  which Landlord has been furnished.  Any notice to Tenant hereunder shall be ineffective unless a copy of same has been delivered to Mortgagee.

E.   LANDLORD'S AND TENANT'S OBLIGATION TO EXECUTE AN ESTOPPEL CERTIFICATE.  Landlord and Tenant shall execute and return to each other an estoppel certificate, in the form attached hereto as Exhibit "C", confirming that the Lease is in full force and effect and free of default by either party (or stating any exceptions) within fourteen (14) days after receipt of same.

19.   TENANT'S OBLIGATION TO EXECUTE A SUBORDINATION NON-DISTURBANCE AND ATTORNMENT AGREEMENT.   Tenant agrees to subordinate the Lease to the lien of Landlord's first mortgage upon request of Landlord only so long as Tenant's right of quiet enjoyment under the terms and conditions of the Lease are not disturbed and Tenant receives a fully executed original of a Subordination, Non-Disturbance and Attornment Agreement in the form attached hereto as Exhibit "D" and made a part hereof. Tenant agrees to cooperate with Landlord and Landlord's lenders providing interim and permanent financing for the Shopping Center, and to enter into a Subordination, Non-Disturbance and Attornment Agreement in the form attached hereto as Exhibit "D" ,  with such minor modifications as may be reasonably requested by Landlord's lenders; provided, that said modifications do not affect the economics of the Lease or affect Tenant's rights, remedies, obligations or liability under the Lease, and further provided that Tenant shall only be required to enter into such agreement with the holder of the first mortgage or security deed.

20.   LANDLORD'S DEFAULT.  In the event that Landlord is in default of the Lease, Tenant, without liability, shall be entitled to cure same and deduct the reasonable, actual cost thereof from Rental, Percentage Payments or any other sums payable by Tenant under the Lease in addition to all remedies available at law or in equity, provided that it shall furnish Landlord and any mortgagee of Landlord, the name and address of which Tenant previously has been furnished prior notice thereof, and permit same to cure the default within thirty (30) days thereafter, and further provided that Tenant shall be obligated to furnish Landlord and any mortgagee of Landlord only such notice as is reasonable and practicable (if any) under the circumstances and an opportunity to cure a default in the case of an emergency situation.

21.  A. REAL ESTATE TAXES    Landlord or Tenant shall petition the local taxing authority and obtain a separate real estate tax bill for the Demised Premises together with the Common Area specifically serving the Demised Premises as outlined in yellow on Exhibit "A"

attached hereto and marked "Kroger Tax Lot". If such petition is granted, in lieu of paying a prorata share of real estate taxes for the Demised Premises and Shopping Center as above provided, Tenant shall pay all real estate taxes and assessments levied against the Kroger Tax Lot. Tenant shall pay the same on or before the due date thereof, failing which Landlord may pay such real estate taxes and assessments and Tenant shall reimburse Landlord therefor within thirty (30) days after delivery of written notice from Landlord. If Tenant desires to contest real estate taxes and assessments assessed against the Kroger Tax Lot, then Tenant shall (i) give Landlord written notice thereof; (ii) post reasonable security for payment of taxes; (iii) diligently pursue its contest to completion; and (iv) in any event, promptly pay all amounts required to prevent foreclosure of a tax lien, failing which Landlord may pay the same and Tenant shall reimburse Landlord within ten (10) days of delivery of written notice from Landlord, along with a copy of the paid tax bill for the Kroger Tax Lot. In the event that the parties are not successful in having the Kroger Tax Lot separately assessed, then commencing on the Rental Commencement Date, Tenant shall reimburse Landlord for Tenant's prorata share of all of the real estate taxes and assessments levied on the Shopping Center. Tenant's prorata share shall be in the ratio that the square footage of the Demised Premises bears to the total square footage in the Shopping Center. The Landlord shall furnish Tenant copies of all tax bills as well as all computations used to calculate Tenant's prorata share of real estate taxes in addition to any other documentation reasonably requested by Tenant, and Tenant shall be entitled to audit Landlord's records for real estate taxes and assessment on the Shopping Center at any reasonable time, provided that Landlord shall be entitled to destroy its records for same after three (3) years of the assessment. Tenant shall reimburse Landlord for such expenses within thirty (30) days after its receipt of the billing and the documentation set forth above. In the event that Tenant should in good faith dispute Landlord's bill or calculation it shall notify Landlord within such thirty (30) day period of the portion thereof in dispute and shall be relieved of payment of such disputed portion until such dispute is resolved. Tenant shall be obligated to pay to Landlord its prorata share of the real estate taxes and assessments not disputed. Landlord shall pay prior to all delinquency any and all real estate taxes and assessments levied against the Shopping Center (including the Demised Premises), provided Tenant timely pays its pro rata share to Landlord. In the event that Landlord fails to pay such real estate taxes and assessments in a timely manner, Tenant shall be relieved from any liability to pay its prorata share of any penalty and interest assessed by reason of such failure provided that Tenant makes a timely payment of its proportionate share of undisputed real estate taxes and assessments to Landlord after receipt of billing, in accordance with this Paragraph. In the event of any proposed increase in the real estate taxes which Landlord intends to contest, Landlord shall notify Tenant of such proposed increase and of Landlord's intent to contest same; and Tenant shall be entitled to join in such contest at Landlord's expense and shall be entitled to require Landlord to contest any such increase. Landlord also agrees to join in any contest proceeding initiated by Tenant. In the event that Landlord fails to bill Tenant for its

prorata share of the real estate taxes within one (1) year after Landlord's receipt of a billing, Tenant shall be relieved from payment of its prorata share of such real estate taxes assessed under the billing. Any payments made by Tenant under this Paragraph shall be a non-cumulative set off against Percentage Payments.

      B.  <u>COMMON AREA MAINTENANCE REIMBURSEMENT</u>. Commencing on the date upon which Rental becomes due hereunder, Landlord shall invoice Tenant, quarterly, for Tenant's pro rata share of the costs incurred by Landlord in the maintenance and repair of the Common Area, including the backup invoices and documentation reasonably necessary to evidence the work performed and the payment made therefor, and the manner in which Tenant's pro rata share was calculated. Tenant shall reimburse Landlord for such pro rata share within thirty (30) days after its receipt of the invoice and documentation set forth above. Tenant's pro rata share shall be in the ratio that the square footage of building area in the Demised Premises (excluding the enclosed dock) bears to the total square footage of all building area in the Shopping Center. Notwithstanding the preceding sentence, Landlord shall require the tenant or owner of the Outlots to contribute its pro rata share of maintenance and repairs (including, without limitation striping) associated with the interior drives and entrances to the Shopping Center which are adjoining or in proximity to the Outlots and identified as the area outlined in blue on the Plot Plan after such tenant or owner of the Outlot opens for business. In no event shall Tenant be responsible for any portion of Landlord's costs associated with or related to: (i) office overhead, management fees, salaries, depreciation and administrative costs; (ii) replacements; (iii) expenditures which typically would be capitalized as opposed to expensed, or those which add value to the Shopping Center rather than returning the Shopping Center to its prior condition; or (iv) any single expenditure exceeding $10,000.00 for which Landlord has not received Tenant's prior written approval.

      Landlord and Tenant agree that since the parking lot lighting standards in front of the Demised Premises are to be wired and metered through Tenant's electric meter that Tenant's sole obligation in connection with payment for parking lot lighting as a Common Area maintenance expense shall be to pay the utility charges incurred in the operation of the parking lot lighting standards wired directly to Tenant's meter. Landlord assumes all other maintenance and repair obligations of these parking lot lighting standards and all other Common Area lighting standards.

      Landlord acknowledges the need for Tenant to close its book on a timely basis, and hereby waives any and all rights, whether legal or equitable, in and to any reimbursement from Tenant for charges incurred unless such charges are invoiced to Tenant no later than two years after such charges are incurred by Landlord. Any payments made by Tenant under this Paragraph shall constitute a non-cumulative set off against Percentage Payments.

-16-

C.   <u>INSURANCE PREMIUM REIMBURSEMENT</u>.   Commencing on the date upon which Rental becomes due hereunder, Tenant shall reimburse Landlord for its pro rata share of Landlord's insurance premiums incurred pursuant to Paragraph 11 hereof, prorated to the Rental commencement date.   Tenant's pro rata share shall be in the ratio that the square footage of building area in the Demised Premises (excluding the enclosed dock) bears to the total square footage of all building area in the Shopping Center for which Landlord has obtained insurance. Landlord shall bill Tenant within sixty (60) days of the date of Landlord's payment of premiums, which billings shall be accompanied by legible copies of the paid premium invoices and such additional information as may be necessary to calculate Tenant's pro rata share.   Tenant shall pay its pro rata share of insurance premiums within thirty (30) days after receipt of paid invoices from Landlord. If Landlord fails to bill Tenant within one year of the date of Landlord's payment of a premium, Tenant's reimbursement obligation for that premium shall thereupon be extinguished.

Landlord shall use due diligence and good faith to obtain the insurance at a competitive rate  and upon Tenant's request, but no more frequently than every three years, Landlord shall obtain competitive quotes from at least three insurance companies.  If requested by Tenant, Landlord shall promptly furnish Tenant documentation of Landlord's efforts to obtain competitive insurance rates and copies of competitive quotes.

Tenant, for so long as its tangible net worth is in excess of One Hundred Million Dollars ($100,000,000) or its market capitalization exceeds One Billion Dollars ($1,000,000,000), shall have the right to elect to insure or self insure the Demised Premises Area against fire and casualty upon delivery of notice of such election to Landlord.  Should Tenant make such an election, then Tenant shall not be required to reimburse Landlord for any fire and casualty premiums relating to the Demised Premises incurred pursuant to Paragraph 11 hereof. Within a reasonable time of Landlord's written request, Tenant shall deliver a certificate of insurance to Landlord and Landlord's mortgagee provided Tenant has received written notice delivered by certified mail, return receipt requested, of the mortgagee and its address.  In the event of a casualty as contemplated by Paragraph 11 hereof, Tenant shall pay all insurance proceeds for the Demised Premises over to Landlord, excluding proceeds for Tenant's property, leasehold improvements and trade fixtures.

Any payments made by Tenant under this Paragraph shall be a non-cumulative set off against Percentage Payments.

22.  LIMITATIONS OF LANDLORD'S LIABILITY .  Except for any claim or damage arising from (a) Landlord's failure to maintain the insurance required under the Lease, (b) environmental liability under applicable laws, or (c) Landlord's willful breach of Tenant's exclusives or criminal acts, Landlord shall have no personal liability with respect to any of the provisions of the Lease. If Landlord is in default with respect to its obligations under the Lease, Tenant shall look solely to the interests of Landlord in and to the Shopping Center for satisfaction of Tenant's remedies, if any, except as expressly set forth herein. Landlord's liability under the terms of the Lease shall in no event exceed the amount of  its interest in and to the Shopping Center, except as expressly set forth herein. In no event shall any partner or manager of Landlord nor any joint venture of Landlord, nor any officer, director or shareholder of Landlord or any such partner or joint venture of Landlord be personally liable with respect to any of the provisions of the Lease. Any claim, demand or cause of action which may arise on behalf of Tenant against Landlord under the Lease or otherwise relating to the Demised Premises or the Shopping Center shall be enforceable only against Landlord's right, title and interest in the Shopping Center, including all rents, profits and proceeds therefrom, and no other property of Landlord, any successor or assign of Landlord, any partner, shareholder or manager of Landlord, or any partner, shareholder or manager of any successor or assign of Landlord, shall be subject to such claim, demand or cause of action.

23.  NOTICES.  All notices and approvals required or permitted under the Lease shall be written and sent by certified or registered mail, return receipt requested, to Landlord at the address to which Rental is sent with a copy to Winchester Commons, c/o Fairway Investments, 2830 Cahaba Road, Birmingham, AL 35223, Attn: Mr. Guy S. Clifton and to Tenant at: The Kroger Co., 800 Ridge Lake Blvd, Memphis, TN 38120-9427, Attention:  Real Estate Department, or any subsequent address which either party may designate for such purpose. Date of a notice shall be the date on which such notice is deposited in a post office of the United States Postal Service, or successor governmental agency, or upon  delivery or refusable by a reputable overnight courier service (such as Airborne Express or Federal Express), receipt requested.

24 .  RENTAL PAYEE   Rental shall be paid by check drawn to the order of Engel Realty, Inc. and mailed to P. O. Box 187, Birmingham, AL 35201-0187, Attn:  Accounting Department.

25.  ENTIRE AGREEMENT.   The Lease  contains the entire agreement between the parties and there are no other covenants, express or implied, except as contained herein. Any statement, representation, inducement or promise made by either party or an agent of either party which is not contained herein shall be null and void.

-18-

26.   WAIVER NOT IMPLIED.  Any waiver of a provision set forth in the Lease by either party shall not be deemed to imply or constitute a further waiver of the same or any other provision set forth herein.

27.   NON-WAIVER.  In the event that any administrative, legislative or judicial body of competent jurisdiction should find that a provision set forth in the Lease is invalid, all other provisions set forth in the Lease shall remain in full force and effect and shall be unaffected by same.

28.   NO MERGER.   If Landlord or Tenant acquires the interest of the other in the Demised Premises, there shall be no merger of the leasehold estate into the fee simple estate in the Demised Premises.

29.   PARAGRAPH CAPTIONS.   The captions or other headings of any paragraph or sub- paragraph of this Lease Agreement are inserted for convenience only and shall not be deemed a part of this Lease Agreement or construed as in any manner limiting or amplifying the terms and conditions of this Lease Agreement.

30.   SUCCESSORS AND ASSIGNS.   The provisions of the Lease shall bind and inure to the benefit of each party, and its heirs, executors, administrators, successors and assigns.

31.   TERMINATION OF PRIOR GROUND LEASE AGREEMENT.   The Ground Lease Agreement dated December 16, 1997, by and between Tenant and Landlord's predecessor in interest, Faison-Winchester Commons Limited Partnership, is hereby terminated and of not further force or effect.  Landlord and Tenant are hereby released from any obligations heretofore accrued or to accrue under such Ground Lease Agreement.

This Lease Agreement has been executed in four (4) counterparts, each of which constitutes a complete and binding agreement.

Witnesses:

LANDLORD:
ORCHID, L.L.C.,
an Alabama limited liability company

By: _____
     James O. Rein
     Its Manager

-19-

TENANT:
KROGER LIMITED PARTNERSHIP I,
an Ohio limited partnership

By: KRGP, Inc., its general partner

By: _Richard L. Tillman_
Richard L. Tillman
President
Delta Kroger Marketing Area

(Landlord/Corporate Acknowledgment)

STATE OF _ALABAMA_ )
COUNTY OF _Jefferson_ )

This day, before me, a Notary Public of the State and County aforesaid, personally appeared _James D. Rein_ , _manager of Orchid LLC_ , with whom I am personally acquainted and who upon oath acknowledged himself to be such officer of _Orchid LLC_ , a(n) _Alabama Limited liability corporation_, Landlord in the foregoing Lease Agreement, and that he as such _manager_ , being authorized so to do, executed the instrument for the purposes therein contained by signing in the name of the corporation as such officer.

Witness my hand and official seal this _25th_ day of _April_ , 19 _99_ .

_6-10-99_
My commission expires:                        _Denise S. Centralis_
                                                           Notary Public

(Landlord/Partnership Acknowledgment)

STATE OF _____ )
COUNTY OF _____ )

This day, before me, a Notary Public in the State and County aforesaid, personally appeared _____ of _____ , with whom I am personally acquainted and who upon oath acknowledged himself to be _____ of _____ , a _____ partnership, Landlord in the foregoing Lease Agreement, and that he as such _____ , being authorized so to do, executed the instrument for the purposes therein contained by signing in the name of the Partnership.

Witness my hand and official seal this _____ day of _____ , 19__.

_____
                                                           Notary Public

_____
My Commission Expires:

-20-

(Landlord/Individual Acknowledgment)

STATE OF _____ )
COUNTY OF _____ )

This day, before me, a Notary Public of the State and County aforesaid, personally appeared _____, with whom I am personally acquainted and who upon oath acknowledged himself to be the Landlord in the foregoing Lease Agreement and acknowledged the signing to be his voluntary act.

Witness my hand and official seal this _____ day of _____, 19___.

_____
Notary Public

_____
My commission expires:

(Tenant Acknowledgment)

STATE OF TENNESSEE )
COUNTY OF SHELBY  )

The foregoing instrument was acknowledged before me this 27 day of _April_, 1998 by Richard L. Tillman, the President of the Delta Marketing Area for KRGP, Inc., the general partner of Kroger Limited Partnership I, an Ohio limited partnership, on behalf of the limited partnership.

IN WITNESS WHEREOF I have hereunto set my hand and official seal.

_1/17/01_
My Commission expires

_____
Notary Public

MY COMMISSION EXPIRES:
JANUARY 17, 2001

-21-

Page 1

1       IN THE CIRCUIT COURT OF SHELBY COUNTY,

2    TENNESSEE  FOR THE THIRTIETH JUDICIAL

             DISTRICT AT MEMPHIS

3

4

    LILLIAN BROOKS and

5    ANTHONY L. BROOKS,

6

7               Plaintiffs,

8

9    Vs.            Case No. CT-005835-08

10    TUWAYNE SHIVERS, THE

      KROGER COMPANY, a Corporation

11    and INLAND WESTERN MEMPHIS

      WINCHESTER, LLC,

12

13              Defendants.

14

15        THE DEPOSITION OF

16     BRIAN QUINTON MIDDLETON

17       September 29, 2009

18

19

20

21

22

     ALPHA REPORTING CORPORATION

23     AMY DILLINGER, CSR, RPR

       236 Adams Avenue

24     Memphis, Tennessee 38103

EXHIBIT
C

Page 2

```
 1          The Deposition of BRIAN QUINTON
 2   MIDDLETON was taken on behalf of the
 3   Plaintiffs, pursuant to Notice, September 29,
 4   2009, beginning at approximately 10:00 o'clock
 5   a.m., in the offices of Glankler Brown, 6000
 6   Poplar Avenue, Memphis, Tennessee.
 7          This deposition is taken pursuant to
 8   the terms and provisions of Tennessee Rules of
 9   Civil Procedure.
10          All forms and formalities, including
11   the signature of the witness, are waived and
12   objections alone for matters of incompetency,
13   irrelevancy and immateriality of the testimony
14   are reserved to be presented and disposed of at
15   or before the hearing.   Objections as to the
16   form of the question must be made at the taking
17   of the deposition.
18
19
20
21
22
23
24
```

Page 4

```
 1   DIRECT EXAMINATION
     BY MR. HALE................................. 5
 2
     CROSS EXAMINATION
 3   BY MR. FEIGELSON.......................... 93
 4   REDIRECT EXAMINATION
     BY MR. HALE................................ 111
 5
 6   Exhibit 1-photo............................ 56
 7   Exhibit 2-lease agreement................. 62
 8   Exhibit 3-photos.......................... 86
 9   Exhibit 4-photos.......................... 89
10   Exhibit 5-drawing......................... 98
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
                A P P E A R A N C E S
 1
 2
 3
 4   For the Plaintiff:
         ROBERT B.C. HALE, ESQ.
 5       Glankler Brown
         1700 - One Commerce Square
 6       Memphis, Tennessee 38103
         525-1322
 7
 8
     For the Defendant Kroger:
 9       KENNETH R. RUDSTROM, ESQ.
         Spicer Rudstrom, LLC
10       175 Toyota Plaza
         Suite 800
11       Memphis, Tennessee 38103
         523-1333
12
13
     For the Defendant Inland Western:
14       DAVID I. FEIGELSON, ESQ.
         Petkoff & Feigelson
15       305 Washington Avenue
         Suite 201
16       Memphis, Tennessee 38103-1911
         523-1050
17
18
     Reported by: AMY DILLINGER, CSR, RPR
19       Alpha Reporting Corporation
         236 Adams Avenue
20       Memphis, Tennessee 38103
         (901) 523-8974
21
22
23
24
```

Page

```
 1         BRIAN QUINTON MIDDLETON
 2   after having been duly sworn, was deposed and
 3   testified as follows:
 4         DIRECT EXAMINATION
 5   BY MR. HALE:
 6   Q.     Mr. Middleton, my name is Rob Hale and
 7   you and I met for the first time just a moment
 8   ago; is that correct?
 9   A.     Yes.
10   Q.     Have you ever been deposed before?
11   A.     Yes.
12   Q.     And you understand how this works and
13   the process?
14   A.     Yes.
15   Q.     The ground rules are pretty simple.
16   Please let me get my question out in its
17   entirety like you have been doing before you
18   begin your response, and if you need a break at
19   any time, tell me, and I'll be happy to take a
20   break.  It's not meant to be torture, and
21   please say yes or no and give any explanation
22   you want as opposed to nodding your head or
23   saying un-unh or uh-huh, just to help the court
24   reporter?
```

Page 6

1   A.   I understand.
2   Q.   Please state your full name?
3   A.   Brian Quinton Middleton.
4   Q.   And your home address?
5   A.   6694 French Cove.
6   Q.   If I ask you a question at any time
7   that you don't understand, any part of the
8   question you don't understand, will you stop me
9   and ask me to repeat the question, please?
10  A.   Yes.
11  Q.   At the end of the deposition I'm
12  probably going to ask you, if I recall, did you
13  understand all of my questions. So I want to
14  make sure if you have any qualms about what I'm
15  asking or don't understand what I'm asking,
16  stop me and say repeat it or say it a different
17  way or anything you need, okay?
18  A.   Okay.
19  Q.   You're not on any medication today that
20  would affect your ability to testify, are you?
21  A.   No.
22  Q.   Who are you employed by?
23  A.   Kroger Company.
24  Q.   How long have you been employed by the

Page 7

1   Kroger Company?
2   A.   Five years.
3   Q.   Where is your office address?
4   A.   800 Ridgelake Boulevard.
5   Q.   Has that been your office address for
6   the last five years?
7   A.   It's been my office address for the
8   last year and a half.
9   Q.   Prior to that where was your office
10  address?
11  A.   I worked in several different stores as
12  a co-manager around the Memphis area.
13  Q.   Did you work at the store that's
14  involved in this matter, the store on
15  Winchester?
16  A.   No.
17  Q.   Did you ever go to that store as a
18  Kroger employee for any reason?
19  A.   No.
20  Q.   Did you visit that store as part of the
21  lease negotiations or anything like that?
22  A.   No.
23  Q.   Have you ever been to that store?
24  A.   Yes.

Page 8

1   Q.   Just to shop?
2   A.   Yes.
3   Q.   Personally to shop?
4   A.   Yes.
5   Q.   You weren't there as a secret shopper
6   or anything like that for the Kroger store?
7   A.   No.
8   Q.   When you started with Kroger, what was
9   your first position?
10  A.   Co-manager.
11  Q.   How long were you a co-manager?
12  A.   Three years.
13  Q.   Which stores did you work at?
14  A.   I worked at Kirby and Quince, American
15  Way; the store West Memphis, Arkansas; the
16  store in Olive Branch, in '78, and I had some
17  short assignments at Mendenhall and Sanderlin,
18  and that's it.
19  Q.   So, the best you can recollect today,
20  you've worked as a co-manager in five different
21  Kroger stores?
22  A.   Yes.
23  Q.   How many Kroger stores are in the
24  greater Memphis area more or less?

Page 9

1   A.   In the greater Memphis area, it's 36.
2   Q.   Is there an oversight management area
3   that defines within the big Kroger, national
4   Kroger that defines a geographic area,
5   according to Kroger?
6   A.   Yes.
7   Q.   What does Kroger call this area?
8   A.   Delta marketing area.
9   Q.   How many stores are in the Delta
10  marketing area?
11  A.   A hundred and ten.
12  Q.   Where does it go?
13  A.   Memphis, Jackson, Mississippi, Jackson,
14  Tennessee and Paducah, Kentucky.
15  Q.   How many stores are there within Kroger
16  altogether?
17  A.   Maybe fifteen hundred.
18  Q.   Does an individual store have a
19  particular budget keyed to that store?
20  A.   Yes, for new stores, yes.
21  Q.   What about existing stores, does it
22  have a budget it's suppose to meet, for
23  instance, with respect to employee expenses or
24  labor expenses?

Page 10

1   A.    Yes.
2   Q.    What about a budget with respect to
3   repairs to the inside of the store?
4   A.    Yes.
5   Q.    And is there a budget with respect to
6   the repairs to the external facade of the
7   store?
8   A.    Yes.
9   Q.    Is that a separate budget line item, or
10  is it the same as the internal?
11  A.    It's the same.
12  Q.    Is there a budget for any repairs for
13  the parking lot at the stores?
14  A.    For leased or Kroger owned stores?
15  Q.    Let's talk about Kroger owned stores?
16  A.    It depends.
17  Q.    I assume what you're telling me the way
18  Kroger works some of the stores Kroger goes to
19  a builder and says, build me a store, here's my
20  spot, I own the property, here's what I want
21  you to build?
22  A.    We don't get involved with the parking
23  lot. We just focus on the store building and
24  what goes inside the store.

Page 11

1   Q.    Does Kroger own some of the land on
2   which the store sits?
3   A.    There are some Kroger owned stores.
4   Q.    Have you ever worked at a Kroger owned
5   store?
6   A.    Kirby and Quince we own the building.
7   Q.    Who owns the parking lot at the Kirby
8   and Quince store?
9   A.    I don't know the name of the shopping
10  center owner.
11  Q.    What you're telling me though is that
12  you at the Kirby and Quince facility, while you
13  may own the building, you don't own the area
14  outside of the building?
15  A.    Exactly.   Olive Branch is a Kroger
16  owned building and Utley owns the parking lot
17  and the rest of the shopping center.
18  Q.    Are Kroger employees responsible for
19  cleaning any of the area on the exterior of the
20  building as far as trash pickup?
21  A.    When you say exterior?
22  Q.    Once you go out the entrance and exit
23  doors?
24  A.    It depends if it's a Kroger owned store

Page 12

1   or a leased facility.
2   Q.    All right. I can -- let's talk about
3   a leased facility?
4   A.    No.
5   Q.    Okay. You understand I'm talking about
6   the address that is at issue here is 7942
7   Winchester; do you understand that?
8   A.    Yes.
9   Q.    If I say the store from now on in the
10  deposition, can we agree we're talking about
11  that particular Kroger store at 7942
12  Winchester, okay?
13  A.    Yes.
14  Q.    If I am talking about other stores,
15  I'll specifically mention them; is that okay?
16  A.    Yes.
17  Q.    With respect to the store we're talking
18  about here that's a leased facility?
19  A.    Yes.
20  Q.    If a Kroger store sees a McDonald's bag
21  out on the parking lot --
22  A.    (Interposing.) It shouldn't be out
23  there, but, no.
24  Q.    Why shouldn't it be out here?

Page 1

1   A.    Because the property owner is in charge
2   of the maintenance of the parking lot that's
3   sweeping paving, restriping the parking lot,
4   lights.
5   Q.    What about the area before you get to
6   the parking lot just outside the doors of the
7   stores, who's responsible for that store?
8   A.    Just outside of the door?
9   Q.    Yeah, where the benches are and where
10  you have plants to sell and all kind of good
11  stuff like that, who's responsible for that
12  area?
13  A.    The property owner.
14  Q.    Okay. That's true if you guys are
15  watering plants and dirt and debris falls out
16  of the plants, that's somebody else's property?
17  A.    The Kroger employee will sweep that
18  area.
19  Q.    The area we're talking about now is the
20  area right there outside door and before you
21  get to the roadway; is that correct?
22  A.    Yes.
23  Q.    That area is an area that Kroger
24  employees have some responsibility to keep

4 (Pages 10 to 13)

Page 14

1   clean?
2   A.   As needed, yes.
3   Q.   And a McDonald's bag, if some person
4   has thrown it on the ground, would a Kroger
5   employee pick it up and throw it away?
6   A.   Yes.
7   Q.   Would you expect him to do that?
8   A.   Yes.
9   Q.   Would that be part of his job
10  responsibilities?
11  A.   I wouldn't say that.  It's just
12  keeping the -- keeping the front of the store
13  clean.
14  Q.   You want the store to look good for the
15  patrons?
16  A.   Yeah, and I would pick it up if I
17  walked up and saw that.
18  Q.   That's because you're a good person?
19  A.   Kroger employees are good people.
20       MR. HALE:   Off the record.
21       (Off the record discussion.)
22  BY MR. HALE:
23  Q.   All right, Mr. Middleton, let me get
24  some background; what's your educational

Page 15

1   background?
2   A.   I have a bachelor's degree in
3   accounting from the LeMoyne-Owen University and
4   a master's degree from the University of
5   Phoenix.
6   Q.   In what?
7   A.   Business administration.
8   Q.   All of this is geared to business?
9   A.   Yes.
10  Q.   Is it fair to say you don't have an
11  engineering degree?
12  A.   Yes.
13  Q.   And you don't claim to have any
14  expertise in parking lot design?
15  A.   No.
16  Q.   Lighting?
17  A.   No.
18  Q.   Does Kroger employ anybody in the Delta
19  region?
20  A.   Delta division.
21  Q.   Who has any responsibility for
22  oversight or review of leases or leased plants
23  as it relates to parking lots?
24  A.   No.

Page 16

1   Q.   In other words I'm asking whether
2   Kroger has somebody whose part of their
3   responsibility would be to make sure that
4   properties that they lease are reviewed for
5   safety for their patrons?
6   A.   Prior to construction?
7   Q.   Prior or after, and I'm not talking
8   about internally, but externally the roadways,
9   the parking areas, lighting, those kind of
10  things in the Delta area, is there a person who
11  looks at leases and the premises even after
12  it's leased and before it's leased to make some
13  sort of determination for Kroger as to whether
14  it's safe or unsafe for their patrons?
15  A.   I don't know.
16  Q.   What about in this local market here in
17  Memphis, is there anybody here who has the
18  responsibility for Kroger to periodically go
19  around and check their leased premises to make
20  sure that their landlords are doing whatever it
21  is the lease may require the landlords to do to
22  make sure that the premises are safe for
23  patrons?
24  A.   No one from Kroger, because that would

Page 17

1   be a store employee and store employees aren't
2   familiar with the leases and what is asked of
3   the property owner.
4   Q.   So, in essence, nobody from Kroger side
5   has the responsibility to make sure that the
6   parking lots are safe for the pedestrians?
7   A.   No.
8   Q.   Do you know whether anybody at the
9   store level and in particular let's talk about
10  the store in question, the Winchester store,
11  whether anybody at that store had the
12  responsibility and duty as part of their job to
13  periodically survey the parking lot to make
14  sure that everything was in order?
15  A.   When you say in order?
16  Q.   Whether all of the lights are working
17  properly, whether the painted striping on the
18  roadway is still in good repair and visible,
19  anybody from Kroger have that responsibility?
20  A.   No.
21  Q.   I'm assuming you're not telling me that
22  Kroger didn't care about whether these things
23  are done; is that correct?
24  A.   I'm not saying that.  In cases where

5 (Pages 14 to 17)

Page 18

1    it's a shopping center, the shopping center
2    owner would have someone following up on the
3    parking lot and the maintenance of the parking
4    lot. That's not done by Kroger or someone
5    inside of the store.
6    Q.    With respect to this particular store,
7    who is it that is responsible from the
8    landlord's side and in particular an
9    individual, if you know, from the landlord's
10   side to make sure that the parking lot is safe?
11   A.    I don't know the individual, but Inland
12   is the owner of the shopping center.
13   Q.    Have you ever talked to anybody at
14   Inland?
15   A.    No, we have an ASP that does a lot of
16   the property management work and I manage it
17   through her, so I never had any contact.
18   Q.    You're going to have to help me with
19   the lingo. What's an ASP?
20   A.    Admin support personnel, secretary.
21   Q.    Is that a Kroger person?
22   A.    A Kroger person in my office.
23   Q.    What's her name?
24   A.    Carol York.

Page 19

1    Q.    Ms. York, for the purpose there had
2    been any communication with Inland, Ms. York
3    would have had conversations if there were any
4    with people with Inland; is that correct?
5    A.    Yes, with the property manager.
6    Q.    Who is that?
7    A.    Maggie Dean. I don't know who it was
8    in 2007, but right now it's Maggie Dean.
9    Q.    Do you know whether any of the store
10   employees, managers or down at the store on
11   Winchester, had ever talked to Maggie Dean
12   about any issue?
13   A.    No, because they are in contact with
14   the real estate person, and we're a liaison
15   between the property and the property owner.
16   Q.    Your ASP would contact the landlord, if
17   there are were any issues with the property?
18   A.    Yes.
19   Q.    Do you know of any issues that have
20   occurred at the property?
21   A.    Leaky roof.
22   Q.    Anything else?
23   A.    Potholes behind the store near the
24   loading area. There was a light out by the

Page 20

1    Wendy's. That's all I know. Not that much.
2    Q.    All right. So I assume what you're
3    telling me somebody at the store recognized
4    there was a pothole out back where you have to
5    load and unload your trucks, I take it?
6    A.    It wasn't someone in the store. It was
7    the Kroger driver.
8    Q.    A Kroger employee?
9    A.    Yes.
10   Q.    Recognized there was a problem with the
11   roadway out back where you load and unload
12   trucks?
13   A.    Well, it was actually in front of the
14   loading dock.
15   Q.    And they then -- it was enough of an
16   issue for them that they reported to somebody,
17   I assume, in the store?
18   A.    Well, they called real estate directly,
19   I believe.
20   Q.    So, is it a different department that
21   the delivery people are in?
22   A.    Yes, the distribution center.
23   Q.    This distribution center employee knew
24   to make a call to you when they saw there was a

Page 21

1    problem with the loading and unloading area
2    where they have to drive over, and they made a
3    phone call to you and reported that problem; is
4    that right?
5    A.    Yes.
6    Q.    It made it difficult for them to get in
7    and out where they needed to be at; is that
8    correct?
9    A.    Yes.
10   Q.    And you turned around and reported it
11   to the landlord?
12   A.    Yes.
13   Q.    What about the light that was by
14   Wendy's, how did that come about?
15   A.    I believe the light is by a fuel
16   center, and it was.
17         MR. FEIGELSON: Did you say fuel?
18         THE WITNESS: Yes, I know it was
19   near a fuel center. I don't have any
20   background on it or who reported it.
21   BY MR. HALE:
22   Q.    Do you believe it was somebody who
23   worked for that particular store?
24   A.    If it's near the fuel center, probably

6 (Pages 18 to 21)

Page 22

1  a fuel center clerk.
2  Q.     And are they instructed, if they see a
3  problem like a light out, to call your office?
4  A.     To let the store manager know and the
5  store manager call us.
6  Q.     So, is that person in the area where
7  the gasoline is?
8  A.     A kiosk.
9  Q.     And you can buy gas at a discounted
10 rate if you buy enough groceries?
11 A.     Yes.
12 Q.     They in turn, the hierarchy is to
13 report it to the manager of the store?
14 A.     Uh-huh.
15 Q.     Is that yes?
16 A.     I'm sorry, yes.
17 Q.     Everybody does it, and the store
18 manager in turn would call your department?
19 A.     Yes.
20 Q.     And speak to Ms. York, it was?
21 A.     Yes.
22 Q.     And in turn she would call the
23 landlord?
24 A.     Yes.

Page 23

1  Q.     So, I take it then the store employees,
2  whether they're in the kiosk or in the store
3  have been instructed, if you see a problem with
4  the light out or something, you need to report
5  it to somebody so it can get fixed?
6  A.     Yes.
7  Q.     Is that right?
8  A.     Yes.
9  Q.     With respect to that particular store,
10 I'm assuming that the landlord doesn't have the
11 obligation to go get the shopping carts out of
12 the parking lot, do they?
13 A.     No.
14 Q.     That's a Kroger responsibility,
15 correct?
16 A.     Yes.
17 Q.     So, periodically employees of Kroger
18 are out on the parking lot; is that right?
19 A.     Uh-huh.
20 Q.     Is that yes?
21 A.     Yes, I'm sorry.
22 Q.     And I guess once more some people want
23 help getting their groceries into the parking
24 lot; is that correct?

Page 24

1  A.     Yes.
2  Q.     So store employees go out on the
3  parking lot to help people put the goods in the
4  parking lot?
5  A.     Yes.
6  Q.     And do those employees, have they been
7  told if you see a problem, make sure you tell
8  your manager?
9  A.     I don't know.  That's a bagger and
10 sometimes there is a breakdown in
11 communication.
12 Q.     Would you expect any Kroger employee,
13 if they saw a hole or a light out in the
14 parking lot in a dark area if they saw and
15 recognized it, would you expect them to tell
16 somebody?
17 A.     Yes.
18 Q.     And that would work its way up to your
19 office?
20 A.     Yes.
21 Q.     And you would agree to the extent they
22 see something amiss or wrong in the parking lot
23 are required or should report it to their
24 higher ups in the store?

Page 25

1  A.     Yes.
2  Q.     And is it fair to say that Kroger
3  employees are in and around the parking lot
4  essentially all the time the store is open?  I
5  don't mean every second, but this is a pretty
6  constant activity of people going out to the
7  parking lot and delivering and getting carts
8  and bringing them back in?
9  A.     Yes.
10 Q.     I'm not trying to imply they're there
11 every second of every day, but this goes on all
12 day long?
13 A.     Yes.
14 Q.     And the cart retrieval is an all day
15 long event?
16 A.     Yes.
17 Q.     And the grocery help is an all day long
18 event?
19 A.     Yes.
20 Q.     Are managers suppose to periodically
21 inspect the parking lot area to make sure the
22 carts are being brought back timely and
23 appropriately?
24 A.     Yes.

Page 26

1   Q.      They're suppose to look at the parking
2   lot periodically to make sure that the lights
3   are working?
4   A.      No, they're suppose to check to make
5   sure all of the bascarts are off the parking
6   lot.
7         MR. FEIGELSON:  That's what?
8         THE WITNESS:  B A S C A R T,
9   that's what we call them.
10        MR. HALE:  The standard silver
11  baskets that are there.
12        MR. RUDSTROM:  They're not silver
13  anymore.  They're all plastic.
14  BY MR. HALE:
15  Q.      But that's what you're talking about?
16  A.      Yes.
17  Q.      As it relates to the parking lot, it is
18  only people that you're aware of at this
19  particular store to make sure that the carts
20  get brought back in?
21  A.      Yes.
22  Q.      Anything else they're suppose to
23  periodically check on the parking lot?
24  A.      No.

Page 27

1   Q.      Are they suppose to periodically walk
2   the parking lot to make sure there are no
3   hazards in the parking lot?
4   A.      There is a -- the parking lot is part
5   of a store walk for the manager.  It usually
6   begins when they pull up on the parking lot,
7   and if there is any potholes on the parking lot
8   as they're walking to the front of the store,
9   they're suppose to document it and report it.
10  Q.      What else are they suppose to report?
11  I assume you want them to report anything
12  that's out of the ordinary?
13  A.      Yes.
14  Q.      Anything they see that they think might
15  be dangerous?
16  A.      Yes.
17  Q.      Is there any written policy and
18  procedure at Kroger that would apply to that
19  particular store out on Winchester as it
20  relates to what they're suppose to look at or
21  see the managers, that is, when they're either
22  coming into the store or doing a periodic check
23  of the external area?
24  A.      When you say a written policy?

Page 28

1   Q.      I assume Kroger has some sort of
2   written policy to govern what their employees
3   are suppose to do; is that correct?
4   A.      There is a check list.  I'm not sure
5   it's a policy but a check list.
6   Q.      A document that's called a check list?
7   A.      Yes.
8   Q.      Is it a daily check list?
9   A.      Yes.
10  Q.      Is each store suppose to do that once a
11  day or more than once a day?
12  A.      Once a day.
13  Q.      In the store at Winchester, if they're
14  following the policy at Kroger, as you
15  understand, it would have a check list for the
16  day of December 21, 2007?
17  A.      They should.
18  Q.      I understand how the world works and
19  perhaps not every store does what they're
20  suppose to do all the time, but if they're
21  following what you understand the policy to be
22  on December 21, 2007 there is a check list on
23  Winchester?
24  A.      Yes.

Page 29

1   Q.      The check list would include what as
2   its relates to the external side, talking about
3   the parking lot?
4   A.      Potholes, parking lot adequately
5   striped, any debris in the parking lot.  I
6   believe that's it.
7   Q.      While I'm thinking about it, I don't
8   want to know anything you talked to Mr.
9   Rudstrom about.  I'm not entitled to know that,
10  okay, but have you reviewed any documents in
11  preparation for your testimony today?
12  A.      When you say documents?
13  Q.      Any piece of paper, doesn't have to be
14  a formal document, have you looked at anything
15  in preparation for your deposition today other
16  than correspondence that was sent to you by
17  your lawyer?
18  A.      No.
19  Q.      Have you reviewed the lease?
20  A.      Yes.
21  Q.      Well, that's a document as far as I'm
22  concerned.  That's what I'm getting at.  Have
23  you reviewed anything other than the lease?
24  A.      That's it, the lease and quit claim

**Page 30**

1 deed.
2 Q.    What was quit claimed?
3 A.    The property.  Inland wasn't always
4 the owner of the property.
5 Q.    Who started out as the owner?
6 A.    I don't know.
7 Q.    Was it Kroger?
8 A.    No.
9 Q.    So, as far as you can tell or remember,
10 some third party owned the land where that
11 shopping center is now?
12 A.    Yes.
13 Q.    And at some point it was quit claimed
14 to Inland?
15 A.    Yes.
16 Q.    Did you have a lease with the previous
17 owner?
18 A.    Yes, a ground lease.
19 Q.    And you have a ground lease now with
20 Kroger?
21 A.    It's a lease agreement with Inland.
22 Q.    With Inland -- let me back up.  You had
23 some sort of lease arrangement with the
24 previous owner, correct?

**Page 31**

1 A.    Yes.
2 Q.    And you told me that was a ground
3 lease?
4 A.    Yes.
5 Q.    And you now have a lease arrangement
6 with what you believe to be the new owner
7 Inland?
8 A.    Yes.
9 Q.    What's the difference between the two
10 arrangements you have with Inland and the
11 previous owner?
12 A.    Ground lease is when you lease just the
13 land, and we own the building, and the land is
14 the -- it's the land where the building sits
15 on.  It's not a parcel, just the land where
16 the building sits, and I don't know the
17 background but we usually do that to secure a
18 good piece of property which is tied up with
19 the ground lease.
20 Q.    Okay.  So, and I guess typically once
21 the improvement is made on the property and the
22 store is built, does the ground lease generally
23 go away and you have a regular lease
24 arrangement?

**Page 32**

1 A.    Not all the time, but in this case the
2 ground lease was incorporated with the lease
3 agreement.
4 Q.    Did you have a formal lease agreement
5 at any point with the previous owner, or has
6 the formal lease agreement always been with
7 Inland?
8 A.    It's always been with Inland, I
9 believe.
10 Q.    Okay.
11    MR. FEIGELSON:  Can you clarify
12 that.  I wasn't quite sure about the last
13 question.
14 BY MR. HALE:
15 Q.    Did you understand what I was getting
16 at in the last question?
17 A.    Yes.
18    MR. FEIGELSON:  All right.
19 BY MR. HALE:
20 Q.    You're on your own.  We were talking a
21 minute ago about the check list you think the
22 store has.  Are there any other, other than the
23 check list, any other documents whether it's
24 policy and procedure manual, just a Kroger

**Page 33**

1 guide or whatever it is, that's provided from
2 higher up, corporate Kroger to the individual
3 store to guide the managers there and
4 co-managers in what they're suppose to do
5 day-to-day in operating the store?
6 A.    Yes.
7 Q.    Okay.  What's that; is there just one
8 document?
9 A.    There are several documents, sales
10 plans, inventory control.
11 Q.    What else?
12 A.    Inventory, a lot has changed since I've
13 been out of the stores, but to my recollection,
14 inventory, sales per day, that's about it.
15 Q.    What about something with respect to
16 the appearance of the store, the cleanliness of
17 the store, are there any documents that concern
18 that?
19 A.    Just a check list.
20 Q.    That would be the only one?
21 A.    Uh-huh.
22 Q.    Is that yes?
23 A.    Yes.
24 Q.    And, obviously, what I'm getting at,

Page 34

1   you know where I'm coming from. I'm trying to
2   find out if there are any policies and
3   procedures, whatever Kroger might call them,
4   that affect what the store employees are
5   suppose to do as relates to keeping the
6   premises internally and externally clean, and
7   you're telling me the only documents that would
8   concern that, as far as you know, is the check
9   list?
10  A.    Yes.
11  Q.    How long is the store suppose to keep
12  the check list?
13  A.    I don't know.
14  Q.    Externally, is it Kroger's intention to
15  have all the stores look the same?
16  A.    From an exterior of our building?
17  Q.    Right.
18  A.    It just depends on the store.
19  Q.    McDonald's all look alike if you've
20  driving down the road and see a McDonald you
21  know it's a McDonald's, right?
22  A.    Uh-huh.
23  Q.    Yes?
24  A.    Yes.

Page 35

1   Q.    Does Kroger have a look they want to
2   put on their facade, whether they can read the
3   sign or not, they already know it's Kroger?
4   A.    Yes.
5   Q.    You more or less want to make them all
6   look as much alike as they can. The idea is to
7   have them all look alike?
8   A.    Yes.
9   Q.    With respect to the area outside the
10  store, now I mean the facade, all the walls and
11  from the roadway that goes by and out to the
12  parking lot, does Kroger care what that looks
13  like?
14  A.    No, I believe the city dictates how the
15  parking lot is suppose to look.   It's a city
16  ordinance, but, no.
17  Q.    If Kroger, if you're going to have a
18  new store, you have bought the piece of
19  property, found a piece of property you want
20  and you're having a new store built, does
21  Kroger have a set of plans it gives to
22  builders?
23  A.    For the store?
24  Q.    Right?

Page 36

1   A.    Yes.
2   Q.    Do they have a set of plans that has
3   anything to do with the exterior of the store,
4   get off the building and out into the parking
5   lot, is there anything in the plans that
6   discusses parking in the parking area at all?
7   A.    No.
8   Q.    So, we found a set of plans for a new
9   Kroger store, you're telling me there wouldn't
10  be anything in there like we want so many
11  parking spaces, we want them this wide and stop
12  signs on the side of the building; would there
13  be anything in the plans like that?
14  A.    No.
15  Q.    While I'm asking about that, do you
16  know whether any of the stores have stop signs
17  either on the building or right up to the edge
18  of the roadway to stop traffic before cars
19  headed in either direction in front of the
20  stores get to the doors for the entrances and
21  exits?
22  A.    I don't know.
23  Q.    You've worked in five stores as the
24  manager; is that correct?

Page 37

1   A.    Uh-huh.
2   Q.    Is that yes?
3   A.    Yes.
4   Q.    I assume you've spent enough time to be
5   intimately familiar with what all five of these
6   stores looks like?
7   A.    Yes.
8   Q.    Do you know whether there were any stop
9   signs, do you understand what I mean by the
10  placement of stop signs?
11  A.    Yes.
12  Q.    Right before you get to either side of
13  the entrance or exit, correct?
14  A.    Yes.
15  Q.    Do any of the other stores you've
16  worked at have stop signs there?
17  A.    Yes.
18  Q.    How many of them?
19  A.    One that I know of, and that's the
20  store in Olive Branch.
21  Q.    Is that store newer or older than the
22  store out at Winchester?
23  A.    It's older.
24  Q.    It's an older store then?

Page 38

1   A.    Uh-huh.
2   Q.    Is that yes?
3   A.    Yes.
4   Q.    Do you know whether those stop signs
5   were original to when the store was first
6   built?
7   A.    I don't know.
8   Q.    Do you know whether Kroger had any
9   input into the decision to put the stop signs
10  there at the Olive Branch store?
11  A.    No, that's the responsibility with the
12  entity that's owns the common area or owns the
13  parking lot.
14  Q.    What were the stop signs attached to?
15  A.    The asphalt in the street, well, in the
16  parking lot.
17  Q.    Were these signs painted on the street
18  as opposed to red octagonal signs?
19  A.    No, they were in the ground.
20  Q.    You mean it was a sign that was
21  actually set in the ground?
22  A.    Yes.
23  Q.    It was a red standard stop sign like
24  you see on the street?

Page 39

1   A.    Yes.
2   Q.    But it wasn't hung on the column of the
3   building?
4   A.    No.
5   Q.    Or over hang or anything?
6   A.    No.
7   Q.    Do you know whether Kroger, whether
8   that store or above that store level had
9   anything to do with the signs being put in
10  place at the Olive Branch store?
11  A.    No.
12  Q.    If you were the manager of the Olive
13  Branch store and one of the signs was damaged
14  or knocked down, is that the kind of thing you
15  would have reported to the landlord?
16  A.    Yes.
17  Q.    Because you would want those signs to
18  be in good repair?
19  A.    Yes.
20  Q.    Do you think the signs like that in
21  front of store slow some of the traffic?
22  A.    Yes.
23  Q.    Do you think it's a good idea?
24        MR. FEIGELSON:  I'm going to

Page 40

1   object, but you can answer.
2        THE WITNESS:  All stores don't
3   have a stop sign in front.  It just depends on
4   what the property owner wants.
5   BY MR. HALE:
6   Q.    Let me ask it this way.  Kroger is
7   concerned about the people who come in and out
8   of the store, aren't they?
9   A.    Yes.
10  Q.    You want your patrons to be as safe as
11  possible when they walk in and out of your
12  store; is that correct?
13  A.    Yes.
14  Q.    Is there any reason why Kroger hasn't
15  asked all of its landlords to put stop signs
16  right on either side of the entrance and exit
17  doors to stop and slow traffic?
18  A.    Well, Kroger -- I don't know.  We
19  don't deal or real estate doesn't deal with the
20  flow of traffic of the parking lot.   That's
21  something that the property owner should
22  monitor.
23  Q.    Is there a reason why Kroger hasn't
24  asked the property owners to install exterior

Page 41

1   stop signs just before the entrance and exit
2   doors on the properties where it has a Kroger
3   store and where it invites patrons to come in
4   and shop?
5   A.    Can you repeat the question.
6   Q.    Is there a reason why Kroger hasn't
7   asked its landlords to install stop signs just
8   before the entrance and exits doors of its
9   stores?
10  A.    I don't know.
11  Q.    Is there anything that, because of a
12  lease or any other reason, that would prohibit
13  Kroger from asking its landlords, in
14  particular, asking Inland to install stop signs
15  the same location we've been talking about by
16  the entrance and exit doors?
17  A.    Nothing in the lease that would
18  prohibit us from asking.
19  Q.    As far as you know, has anybody from
20  your department ever asked Inland to do
21  anything other than replace a light and fix a
22  pothole as it relates to the property out at
23  Winchester at the store we're talking about?
24  A.    Can you repeat the question.

Page 42

1   Q.    I'm trying to find out, so we're on the
2   same page, I just want to know what all Kroger
3   has asked Inland to do as it relates to the
4   parking area or any area outside the building.
5   You told me earlier about a pothole out back
6   and told me about a light up by the gas kiosk.
7   Do you recall at any time in your department,
8   and your department is the one that deals with
9   Inland?
10  A.    Yes.
11  Q.    And the store shouldn't do that; it
12  should go through you?
13  A.    Yes.
14  Q.    And has your department asked Inland to
15  do anything as it relates to the exterior of
16  the building, and I don't mean the facade, but
17  the area from the pavement on, other than two
18  things you told me about to fix the pothole and
19  fix the light out by the kiosk?
20  A.    I don't recall.
21  Q.    Do you keep records in your department
22  when requests are made of Inland to do
23  something?
24  A.    We do keep a maintenance log.

Page 43

1   Q.    Okay.   Does the maintenance log
2   include fixing the pothole and fixing the pipe
3   by the kiosk?
4   A.    Yes.
5   Q.    Do you have a maintenance log that
6   relates to this store that goes back to
7   December of 2007?
8   A.    No, I do not.
9   Q.    Has it been destroyed?
10  A.    No.
11       MR. RUDSTROM:  I think he
12  misunderstood.
13  BY MR. HALE:
14  Q.    That's fine.  Is there a document back
15  at your office that you could get your hands
16  on, that would be a maintenance log that goes
17  back to December, '07, for this store?
18  A.    Yes.
19  Q.    Do you have any objection to producing
20  that?
21  A.    No.
22  Q.    Or the check list for that matter?
23  A.    I don't know about the check list.
24  That doesn't go through me.  That's up to the

Page 44

1   manager at that time and if they don't have
2   it --
3   Q.    (Interposing.) That check list wouldn't
4   come to your department?
5   A.    No.
6   Q.    But you know if you hadn't been a
7   manager and had been in the leasing department
8   the whole time, you wouldn't know about it?
9   A.    Exactly.
10  Q.    If that exists, it's at the store
11  still?
12  A.    Yes.
13  Q.    And you don't know of any reason why
14  they have to send them off to corporate or
15  anything like that?
16  A.    No.
17  Q.    Before coming today, did you review the
18  maintenance log as it relates to that store?
19  A.    Yes.
20  Q.    Is that why you remember the pothole
21  and the light?
22  A.    Yes.
23  Q.    Would you have recalled that otherwise?
24  A.    Yes, and the roof leak.

Page 4

1   Q.    Okay.   I understand the roof leak.
2   That will get your attention?
3   A.    Yes.
4   Q.    You have looked at the log and you
5   looked at the log as it relates to back in
6   December, '07, the maintenance log?
7   A.    Yes.
8   Q.    And you didn't find anything in that
9   maintenance log where Kroger requested anything
10  of Inland as relates to the parking lot other
11  than what you have told me as it relates other
12  than what you told me, the pothole and the
13  light?
14  A.    That's what I remember, yes.
15  Q.    Is it fair to say that when you
16  reviewed the maintenance log, you never saw
17  anything in there where Kroger requested any
18  improvements to any of the striping or the
19  design of the parking lot area?
20  A.    No.
21  Q.    How long have you been -- has Kroger
22  been in that facility where they were leasing
23  from Inland; do you know how long that's been
24  going on?

Page 46

1    A.     Leasing from Inland, I think Inland
2    took -- I think Inland took the property in
3    2003 or 2004.
4    Q.     Since that time, has there been any
5    painting done, that you're aware of, of the
6    striping whether crosswalks, line dividers or
7    anything like that in the area -- on the
8    roadway directly in front of the store?
9    A.     I don't know.
10   Q.     Has Kroger since that period of time
11   requested any painting of the striping or
12   crosswalk or anything else of the area directly
13   in front of the store from Inland?
14   A.     I don't know.
15   Q.     Would that be in the maintenance log,
16   you believe, if it had been requested?
17   A.     Yes.
18   Q.     That's where that store should go if
19   things are working like they should, if
20   somebody at Kroger had in fact requested that
21   of Inland?
22   A.     Yes.
23   Q.     That's where it would be as far as you
24   know and no other place?

Page 47

1    A.     Yes.
2    Q.     I asked you earlier what you looked at,
3    and you didn't tell me about the maintenance
4    log. You probably didn't remember. Have you
5    looked at anything else?
6    A.     That's it.
7    Q.     Now, these other five Kroger stores
8    you've worked at and we determined at least one
9    has a stop signs; is that right?
10   A.     Uh-huh.
11   Q.     Yes?
12   A.     Yes.
13   Q.     Do these other stores have painted
14   crosswalks in the area where you go in and out
15   of the store; are we on the same page, at some
16   point parking ends and there is a roadway; is
17   that correct?
18   A.     Yes.
19   Q.     And traffic goes both directions, one
20   lane each way; is that correct?
21   A.     Yes.
22   Q.     And once you cross the roadway, you're
23   in the facade area and maybe an overhang and
24   you're close to the front doors, correct?

Page 48

1    A.     Yes.
2    Q.     This is the area I'm focused on. It's
3    the only area I care about. I understand there
4    are striping in the parking lot for lanes to
5    parking, but I'm not asking about that. With
6    respect to the area in the roadway, did the
7    other five Krogers you worked at have
8    crosswalks for the patrons to cross it?
9    A.     I don't remember.
10   Q.     What about speed bumps, did any of the
11   other Krogers you worked at have speed bumps in
12   or around the same area?
13   A.     Yes.
14   Q.     How many of them had speed bumps?
15   A.     I believe two of them.
16   Q.     Which ones?
17   A.     Olive Branch and Sanderlin.
18   Q.     Do you have your own perception or idea
19   why someone would put speed bumps at such a
20   place by the doors at those two Krogers?
21   A.     Slow traffic down.
22   Q.     Do you believe that makes it safer for
23   the patrons to come in and out?
24   A.     My opinion or Kroger's opinion?

Page 49

1    Q.     Well, take Kroger's opinion?
2    A.     Yes.
3    Q.     What about yellow cross hatching all
4    through that area, bright yellow paint, any of
5    the stores where you were a manager or the
6    co-manager at have that kind of paint?
7    A.     I don't remember.
8    Q.     Do you know what I'm talking about?
9    A.     Yes.
10   Q.     When is the last time you were
11   physically on the premises out at the
12   Winchester store?
13   A.     Maybe beginning January or February,
14   2008.
15   Q.     Did you go out there because of this
16   accident?
17   A.     No.
18   Q.     Were you there just shopping?
19   A.     I was there shopping, and I was also
20   looking at the bank space.
21   Q.     The bank space?
22   A.     Yes.
23   Q.     Is that space within the store?
24   A.     Yes, within the store.

1   Q.    Sort of a kiosk?
2   A.    It's not a kiosk.  It's an actual
3   place.
4   Q.    Is that leased to the bank?
5   A.    Yes.
6   Q.    Why were you looking at that?
7   A.    They were coming out, and just to see
8   what we can do with it next.
9   Q.    Whether you can put another bank in
10  there or take over and use it yourself?
11  A.    Yes.
12  Q.    Is that the store you normally shop at?
13  A.    No.
14  Q.    Were you aware of this accident when
15  you went out there at that time?
16  A.    No.
17  Q.    Have you ever gone out there to sort of
18  look at the scene itself where the accident
19  occurred for the purposes of familiarizing
20  yourself of what it looks like?
21  A.    No.
22  Q.    Have you seen any pictures showing or
23  depicting the area near where Ms. Brooks was
24  injured?

1   A.    No.
2   Q.    Do you know whether that store has a
3   crosswalk?
4   A.    I don't know.
5   Q.    Do you know whether that store has
6   speed bumps?
7   A.    I think it has speed bumps.
8   Q.    How close to the front door do you
9   think those speed bumps might be?
10  A.    I don't know.
11  Q.    Do you know when the speed bumps were
12  put there?
13  A.    No.
14  Q.    Did Kroger have anything to do with
15  requesting the speed bumps or having them put
16  there?
17  A.    I don't know.
18  Q.    What about stop signs, does it have
19  stop signs?
20  A.    I don't know.
21  Q.    Crosshatching we were talking about, do
22  you know whether that's on the ground?
23  A.    I don't know.
24  Q.    Let me show you a picture, and I'll

1   tell you I took that picture a couple months
2   after the accident and I know they all look a
3   lot alike.  Can you make that out to be the
4   Kroger out at Winchester?
5   A.    I guess.
6   Q.    Let me show you another picture; does
7   that help you at all?
8   A.    No.  I think it is though.
9   Q.    I'm telling you it is, but don't take
10  my word, if one of those pictures helps you?
11  A.    Yes.
12  Q.    You have three pictures in front of
13  you.  Assuming I'm not lying to you and these
14  were taken at the Kroger out at Winchester, you
15  don't have any reason to dispute that, do you?
16  A.    No.
17  Q.    When looking at these pictures, do you
18  see a stop sign?
19  A.    No.
20  Q.    Do you see a speed bump?
21  A.    No.
22  Q.    Do you see a crosswalk?
23  A.    No.
24  Q.    Do you see any other traffic control

1   information as it relates to pedestrians, cross
2   hatching or anything else?
3   A.    No.
4   Q.    Do you have any reason to believe
5   that's not the way the Kroger looked on
6   December 21st, '07, of course with the
7   exception that it was dark, because it was at
8   night, but do you have any reason to believe
9   that this isn't the way the Kroger looked on
10  December 21, 2007, particularly the parking
11  lot?
12  A.    No.
13  Q.    Since Ms. Brooks was injured in the
14  parking lot, have you made any requests of
15  Inland with regard to the striping on the
16  parking lot or anything else?
17  A.    I don't know.
18  Q.    If you were the manager of the store
19  where this parking lot is, and you were aware
20  of the way this looks, would you have made any
21  request of Inland to do something to mark the
22  area for your patrons?
23  A.    Yes.
24  Q.    What would you have asked?

Page 54

```
 1   A.      For some crosswalks to be installed.
 2   That's my personal opinion.
 3   Q.      That's all I can ask.  By the way,
 4   did Kroger have anything to do with putting
 5   shrubbery in the parking lot?
 6   A.      No.
 7   Q.      That would be Inland's responsibility?
 8   A.      Yes.
 9   Q.      Did the other stores have shrubberies
10   close to the roadway?
11   A.      I don't remember.  Whatever the city
12   asked of the owner, that's what they put.
13   Q.      I guess some municipalities are harder
14   on the owner about what they got to do?
15   A.      Yes.
16   Q.      Like Bartlett is pretty tough on you
17   and certain areas require more?
18   A.      Yes.
19   Q.      Do you personally think it's a good
20   idea to have shrubberies up near the edge of
21   the roadway where the patrons are crossing from
22   the roadway to the parking area and stepping
23   out into the roadway?
24           MR. RUDSTROM:  I'm going to
```

Page 55

```
 1   object, and I think you're getting in the area
 2   of expert opinion on this, and I'll let him
 3   answer.
 4   BY MR. HALE:
 5   Q.      So, you were concerned about the people
 6   coming in and out of the store?
 7   A.      Yes.
 8   Q.      And you want your patrons to be as safe
 9   as they can?
10   A.      Yes.
11   Q.      And being a store manager you kept your
12   eyes out for things that you thought might be a
13   hazards for patrons coming in and out of the
14   store?
15   A.      I wouldn't call this a hazard.
16   Q.      I willing ask you that later, but you
17   would look and if you saw something that you
18   thought was potentially a hazard, would you
19   think about it and say, look, I need to tell
20   somebody to do something about it if you saw
21   something?
22   A.      Yes.
23   Q.      Now I'm asking about the shrubberies.
24   With the store manager's experience, do you
```

Page 56

```
 1   think these in any way present a hazard to the
 2   patrons coming to and from the store?
 3   A.      No.
 4           MR. FEIGELSON:  Can you tell us
 5   when you took those.
 6   BY MR. HALE:
 7   Q.      Eventually.  I'm not trying to hide it.
 8   I just don't remember.  I can tell you it was
 9   about four or five days after I talked to Ms.
10   Brooks the first time, but it would have been
11   my guess three or four months after the
12   accident.  That is my shoulder.  I was very
13   tall and I have gotten older and shrunk.
14           MR. HALE:  Let's mark that as
15   Exhibit 1 collectively.
16           (Whereupon, Exhibit 1  was marked as an
17   exhibit to the deposition of the witness and
18   can be found among the deposition exhibits
19   attached hereto.)
20   BY MR. HALE:
21   Q.      Did you review the discovery responses,
22   and by the way, these have to be notarized and
23   sworn to by somebody and it was Lisa Phillips;
24   do you know who Ms. Phillips is?
```

Page 57

```
 1   A.      Yes.
 2   Q.      She's risk management?
 3   A.      Yes.
 4   Q.      Did you have anything to do with the
 5   preparation of these interrogatories or any
 6   request for production of documents?
 7   A.      No.
 8   Q.      This is the first time you ever saw it?
 9   A.      Yes.
10   Q.      I'll tell you the documents that were
11   produced.   I was given a copy of a statement
12   that was taken from a witness, Mr. Vogel; have
13   you ever seen or reviewed that?
14   A.      No.
15   Q.      Have you ever talked to Mr. Vogel?
16   A.      No.
17   Q.      Is it in your job responsibilities to
18   do something like that?
19   A.      No.
20   Q.      I was given a lease.  Does this appear
21   to be the lease between Kroger and Inland?
22   A.      Yes.
23   Q.      And you said you reviewed that, right?
24   A.      Uh-huh.
```

Page 58

```
 1   Q.    Yes?
 2   A.    Yes.
 3   Q.    I was also given what appears to be a
 4   schematic of the store and the parking lot, do
 5   you know of any other documents?  You've told
 6   me about the check list and the maintenance
 7   log.  Do you know of any other documents that
 8   would impact in any way on this case as far as
 9   you know?
10   A.    No.
11   Q.    With respect to the lease arrangements
12   are there any other documents, other than the
13   ones in front of you, that would control any
14   aspect of the lease, any addenda or riders or
15   things like that, that I don't have?
16   A.    No, but there is a lease modification,
17   but that's just for us to add our fuel center.
18   Q.    So I assume that facility didn't have a
19   fuel center originally?
20   A.    No.
21   Q.    And then later you decided to put one
22   in?
23   A.    Yes.
24   Q.    And the lease was modified so you could
```

Page 59

```
 1   take some property up for that portion on
 2   Winchester?
 3   A.    Yes.
 4   Q.    Have you ever been on the premises of
 5   that store at night?
 6   A.    No.
 7   Q.    Do the managers of the particular
 8   stores, and let's ask about this store in
 9   question, do the managers of the store on
10   Winchester have an obligation to periodically
11   check during the nighttime and see whether
12   there is adequate lighting in the parking lot?
13   A.    Yes.
14   Q.    Is there a document that's created in
15   any way; is that part of the check list or
16   anything?
17   A.    No.
18   Q.    But it would be your sense, having been
19   a store manager or now in management at Kroger,
20   that's something you would do periodically to
21   check to make sure there is adequate lighting
22   in the parking lot?
23   A.    Yes.
24   Q.    Those things we talked about earlier,
```

Page 60

```
 1   stop signs and things like that, does Kroger
 2   have an employee who is sort of a managerial
 3   employee who is over safety for the stores?
 4   A.    I don't know.
 5   Q.    No one in your department would have
 6   that responsibility; is that correct?
 7   A.    No.
 8   Q.    And you don't know whether then there
 9   is somebody whose sort of sole responsibility
10   is to make sure the stores themselves are safe
11   and in working order?
12   A.    No.
13   Q.    Is there somebody that Kroger has to
14   make sure there is not any theft from the
15   store?
16   A.    Yes, that's risk management.
17   Q.    Risk management oversees to make sure
18   you're not having an excess amount of goods
19   walk out without being paid for?
20   A.    Yes.
21   Q.    But that's not a safety person that
22   you're aware of?
23   A.    For the store?
24   Q.    Not necessarily just one store.  It
```

Page 61

```
 1   could be somebody that's an area person, a
 2   district person?
 3   A.    Someone in risk management.
 4   Q.    Do you know who that would be?
 5   A.    I think it's Lisa.
 6   Q.    If there is a person in risk management
 7   that has the responsibility to sure that the
 8   stores are being operated as safely as
 9   possible, it's Lisa?
10   A.    Yes.
11   Q.    What's her last name?
12   A.    Phillips.
13   Q.    Do you know whether she had inspected
14   this particular store around the time Ms.
15   Brooks was injured?
16   A.    I don't know.
17   Q.    Have you and Ms. Phillips talked about
18   this incident?
19   A.    She made me aware that she needed me to
20   speak on the lease aspects.
21   Q.    But you and she haven't talked about
22   what happened?
23   A.    She told me that a customer was hit by
24   a car in the parking lot.
```

**Page 62**

1  Q.    Is that the extent of your knowledge of
2  what happened?
3  A.    Yes.
4  Q.    I'm tearing the discovery response
5  apart so I can show you the lease.  You told me
6  there is an addendum or rider that relates to
7  the gas service station area.  Do you believe,
8  other than that document, that this is a
9  complete agreement between Kroger and Inland?
10  A.    Yes.
11  Q.    You're unaware of any other documents
12  that concerns or touches upon or even mentions
13  who has what obligation for either the common
14  areas out there or, in particular, the area
15  right in front of your store?
16  A.    No other documents outside of this?
17  Q.    That's right?
18  A.    No.
19         MR. HALE:  Let's make that
20  Exhibit 2.
21         (Whereupon, Exhibit 2  was marked as an
22  exhibit to the deposition of the witness and
23  can be found among the deposition exhibits
24  attached hereto.)

**Page 63**

1  BY MR. HALE:
2  Q.    Mr. Middleton, does Kroger require its
3  managerial or store employees to fill out any
4  sort of accident report for someone who is
5  injured?
6  A.    Yes.
7  Q.    Do you know whether there is an
8  accident report as relates to what happened to
9  Ms. Brooks?
10  A.    I don't know.
11  Q.    As a store manager or having been a
12  store manager, would you expect there to be
13  one?
14  A.    Should be.
15  Q.    And you weren't given one to review for
16  purposes of this deposition, were you?
17  A.    No.
18  Q.    As part of your responsibilities in the
19  real estate department, do you have anything to
20  do with sort of covers improvements and things
21  like that estimating costs and things like
22  that?
23  A.    For this store or --
24  Q.    For any particular store, I mean in

**Page 64**

1  general, do those kind of things go through the
2  real estate department?  If a store wants to
3  make an improvement, does that go through your
4  department?
5  A.    Yes.
6  Q.    And you seek information from potential
7  contractors and try to get the best bid you can
8  to try to get the work done?
9         MR. FEIGELSON:  Do you need to
10  take a break?
11  BY MR. HALE:
12  Q.    If you need a break, just say so?
13  A.    I'm fine.
14         (Off the record discussion.)
15      (Whereupon, the court reporter
16  read back a portion of the record.)
17  BY MR. HALE:
18  Q.    We can conclude is it your department
19  that would go out and solicit information from
20  the potential contractor?
21  A.    No.
22  Q.    Does the store manager do that?
23  A.    No.
24  Q.    There is another department?

**Page 65**

1  A.    Regional construction does that.
2  Q.    And is that sort of above or below or
3  sideways from you?
4  A.    Sideways.
5  Q.    So as soon as the decision is made that
6  something might be done, you guys kick it out
7  to somebody else to get it done?
8  A.    Yes, pass the baton.
9  Q.    Do you review any of the information
10  that they get?
11  A.    No.
12  Q.    Do you know how expensive it would be
13  to paint a crosswalk in front of a store?
14  A.    No.
15  Q.    Would you, from your own personal
16  knowledge, would you think it's really
17  expensive to paint a crosswalk?
18         MR. FEIGELSON:  Objection.
19  BY MR. HALE:
20  Q.    You can answer?
21  A.    Maybe a couple thousand.
22  Q.    What about stop signs, installing stop
23  signs, do you think that's an expensive item?
24         MR. FEIGELSON:  Same objection.

17 (Pages 62 to 65)

Page 66

1       THE WITNESS:  Maybe a couple
2   thousand, I don't know.
3   BY MR. HALE:
4   Q.      Speed bumps.  Do you think those are
5   expensive items?
6       MR. FEIGELSON:  Same objection.
7   BY MR. HALE:
8   Q.      Do you know?
9   A.      No.
10   Q.      As far as you know, has Kroger ever
11   explored the cost of these kind of things?
12   A.      No.
13   Q.      Would that be in your department?
14   A.      No.
15   Q.      Do you know whether the lease would
16   allow you to make improvements to the parking
17   lot such as adding a parking space if Kroger
18   wanted to do it?
19   A.      Would it allow us to add it ourselves?
20   Q.      Is there anything in that lease that
21   would prohibit Kroger from painting a crosswalk
22   in front of the store?
23   A.      Yes.
24   Q.      What portion of the lease would

Page 67

1   prohibit Kroger from doing that?
2   A.      I believe it's the responsibility
3   section of the tenant.  We are not responsible
4   for that crosswalk.  We're not going to paint
5   it.
6   Q.      I understand that there is an issue of
7   who's responsible.  I get that.   Let's say
8   Kroger said in the interest of the safety of
9   our patrons we believe a crosswalk should be
10   there, okay, and that was just the thought in
11   process Kroger has, is there anything in the
12   lease that says you can't do that as opposed to
13   it isn't necessarily our responsibility to do
14   that; do you see what I'm saying?
15   A.      To do it on our own?
16   Q.      That's right, to do it on your own
17   nickel?
18       MR. FEIGELSON:  I want to note an
19   objection to the extent that the question asks
20   for a legal conclusion.
21   BY MR. HALE:
22   Q.      You work with these leases all the
23   time?
24   A.      Yes.

Page 68

1   Q.      Is that your job?
2   A.      Yes.
3   Q.      Is it your job to know what these
4   leases say?
5   A.      To an extent.
6   Q.      Is it your job to know what these
7   leases make or don't make Kroger do when they
8   enter into it?
9   A.      Can you repeat the last question.
10   Q.      I assume you review these leases?
11   A.      Yes.
12   Q.      And you want to make sure these leases
13   are fair to Kroger?
14   A.      Well, if it's already signed and it's
15   not fair to Kroger, it's out of my hands.
16   Q.      Do you -- let's say it hasn't been
17   signed and part of your review is to make sure
18   it's fair to Kroger?
19   A.      The deal points.
20   Q.      Also, it's part of your responsibility
21   to do what the lease says between you and the
22   landlord?
23   A.      Yes.
24   Q.      You are aware what the language of the

Page 6

1   lease required, and you can understand the
2   language about who has to do what?
3   A.      Yes.
4   Q.      That's all I'm getting at?
5   A.      Okay.
6   Q.      In this particular -- what's for this
7   particular store is there anything in that
8   lease that says Kroger may not make an
9   improvement to the parking lot such as adding a
10   crosswalk?
11   A.      No.
12   Q.      I understand that it may be Kroger's
13   position and it may not be, but it may be
14   Kroger's position, that it's somebody else, the
15   landlord's obligation, but that's not what I'm
16   asking.  I'm trying to find out what Kroger
17   could do if they wanted to.   If Kroger
18   decided to add a crosswalk in that parking lot
19   in that roadway, what you're telling me is if
20   they wanted to foot the nickel out on
21   Winchester, is what you're telling me they
22   could have done that?
23   A.      It could have happened.
24   Q.      Nothing in the lease says they couldn't

Page 70

1 is what I'm getting at?
2 A.    Yes.
3 Q.    And if I ask you the same questions
4 about putting a speed bump, a stop sign or
5 cross hatches or anything else like that, I
6 assume you're going to give me the same answer,
7 they could have; is that right?
8 A.    Yes, but Kroger wouldn't take that
9 stance for the common area, because it's not
10 our responsibility to maintain that common
11 area. Once we get to altering that common
12 area, we become liable, and that's getting
13 outside the lease agreement.
14 Q.    In what way do you become liable?
15       MR. RUDSTROM:    I instruct the
16 witness not to answer. This man is not
17 qualified to answer those questions.
18       MR. HALE: He's the one that told
19 me. I didn't ask the question to elicit that
20 response.
21       MR. RUDSTROM:    And I understand
22 that but you and I know he doesn't know what it
23 means. He's not an expert in that field.
24       MR. HALE:    I can ask him what do

Page 71

1 you mean when he says liable, and you're going
2 to instruct him not to answer?
3       MR. RUDSTROM:    Yes, as far as the
4 legal conclusion, legal definitions, legal
5 conclusion, yes I'm going to instruct him not
6 to answer.
7       MR. HALE:    Including his
8 understanding whether it's legal or not.
9       MR. RUDSTROM:    That's correct, he
10 has used a legal term. You're asking, I
11 suppose if you can couch the question as to
12 what you mean by that term.
13       MR. HALE:    That's all I want to
14 know.
15       MR. RUDSTROM:    Once you get into
16 the legal definition which is where I know
17 where you're going to, I have to instruct him
18 not to answer.
19 BY MR. HALE:
20 Q.    What did you mean when you said you
21 might have liability or would be liable if you
22 made a modification to the parking lot?
23 A.    I meant if we, Kroger, installs speed
24 bumps and, first of all, Kroger wouldn't

Page 72

1 install speed bumps because they're a hazard
2 because people trip over them.    I meant if we
3 install speed bumps and there was an incident
4 on the parking lot, Kroger would -- it would
5 be Kroger's -- it would be on Kroger.
6 Q.    I got you. What about if you --
7 instead we're talking about crosshatching,
8 crosswalks or a stop sign, particularly as it
9 relates to the lease, do you see any problems
10 for Kroger if they did that, if they installed
11 on their own or had somebody else install at
12 their expense, any crosshatching or stop signs,
13 do you see any similar problem?
14       MR. RUDSTROM:    I object to the
15 question, but if you're asking legal
16 ramifications.
17 BY MR. HALE:
18 Q.    I understand.  You said you don't like
19 speed bumps because people might trip over
20 them. Do you see any similar issues if there
21 is a painted crosswalk?
22 A.    No.
23 Q.    Do you see any problems at all like
24 that, as relates to a crosswalk, concerns for

Page 73

1 your patrons about negotiating over the
2 crosswalks?
3 A.    No.
4 Q.    Cross hatching, any concerns for the
5 patrons?
6 A.    No.
7 Q.    What about stop signs, any concerns for
8 your patrons?
9 A.    No.
10 Q.    Okay, that's what I was getting at.
11 Are you aware of any Kroger facility store in
12 the area or any store that you have any
13 oversight over where an election has been made
14 to make an improvement on Kroger's nickel for
15 putting in a crosswalk?
16 A.    No.
17 Q.    Are you aware of any store location
18 where Kroger has requested of the landlord to
19 put in a crosswalk?
20 A.    No.
21 Q.    Or crosshatching?
22 A.    I don't recall.
23 Q.    Or stop sign?
24 A.    I don't recall.

Page 74

1    Q.    Is there a way to try to find out
2    better than your recollection, is there a
3    document that you can go look at to see whether
4    Kroger has ever once asked any of its landlords
5    anywhere, hey, we want you to put in a
6    crosswalk or a stop sign or a speed bump, if
7    you would do that or crosshatching, is there
8    any way to find that out?
9    A.    I don't know.
10   Q.    The area from -- look at Exhibit 1.
11   I'm assuming that your store facility and your
12   sidewalk extends further toward you.  As you
13   look at this picture, the Kroger store is
14   longer?
15   A.    I believe so, yes.
16   Q.    And, also, you can see it pretty well,
17   but as you come up the picture toward me, it
18   goes pretty far down there; is that correct?
19   A.    Yes.
20   Q.    It's a reasonably big box in the
21   parking lot; is it not?
22   A.    Yes.
23   Q.    In this strip center is it the largest
24   structure?

Page 75

1    A.    I think so.
2    Q.    I don't think there is a Best Buy, so
3    Kroger is probably the biggest thing in the
4    shopping center; is that fair?
5    A.    Yes.
6    Q.    The area of the roadway, say 20 feet
7    either side of the front door and the entrance
8    and exit doors, are we on the same page?
9    A.    Yes.
10   Q.    Is it fair to say that the vast
11   majority of the people that would be traversing
12   that area are shoppers for Kroger?
13   A.    Yes.
14   Q.    And if you were going to that parking
15   lot and you were going to shop at any store
16   other than Kroger, you wouldn't be parking in
17   front of the Kroger store?
18   A.    Yes.
19   Q.    It makes more sense to be parking down
20   in front of the store that you would be going
21   to?
22   A.    Yes.
23   Q.    Okay.  The lease that's Exhibit 1
24   were you in the leasing department when that

Page 76

1    was negotiated?
2    A.    No.
3    Q.    In general the leases, that Kroger has
4    with it's landlords, are they negotiated
5    between the Kroger and landlords?
6    A.    Yes.
7    Q.    The terms are fought over?
8    A.    Yes.
9    Q.    And eventually y'all come to terms and
10   the lease is signed?
11   A.    Yes.
12   Q.    Does each individual Kroger store have
13   a budget that's key to that particular
14   location?
15   A.    Can you define a budget.
16   Q.    Well, I assume at the beginning of the
17   year or whenever it is your fiscal year
18   something is sent out to the store that says
19   this is what we expect your opening cost to be,
20   and you need to try to meet this operating
21   cost?
22   A.    Yes.
23   Q.    Okay.  I don't expect you to, and I
24   expect you to tell me I don't know, do you have

Page 77

1    any idea what the operating budget would have
2    included on December 21st, '07 for this store?
3    A.    I don't know.
4    Q.    Having been a store manager, do you
5    have a ballpark for what the operating cost for
6    a store like that would be for a year?
7    A.    Maybe, and when you say operation cost,
8    I mean employees on location; is that what
9    you're getting at?
10   Q.    That's fine.  What I want you to
11   exclude is the cost of the goods that are
12   flowing in there.  Obviously you buy those from
13   vendors and that's huge.  I don't care about
14   that, but running the store, what does the cost
15   to the store, absent the goods that you're
16   going to sell?
17   A.    Five hundred thousand a year.
18   Q.    Your office has never done any sort of
19   study or requested one from another department
20   about the cost of any improvements to a parking
21   lot, has it?
22   A.    No.
23   Q.    Is it fair to say that the store out on
24   Winchester -- obviously Kroger has to operate

Page 78

1    through the humans that work in the store, so
2    is it fair to say that the people who work at
3    the Kroger store out on Winchester have
4    superior knowledge of the grounds around the
5    store than the occasional customer would have?
6    A.     I would assume so.
7    Q.     They're there all the time, are they
8    not?
9    A.     Yes.
10   Q.     And part of their responsibilities is
11   to make sure that the place is safe, correct?
12   A.     Yes.
13   Q.     Okay.   And the superior knowledge
14   would go to things such as lighting and whether
15   or not there are things such as crosswalks,
16   correct?
17   A.     I wouldn't say the crosswalks, because
18   I wouldn't add crosswalks.    Lighting is
19   something more visible.
20   Q.     Well, who's more likely to know that
21   there is or isn't a crosswalk in front of the
22   store, the manager who works there five days a
23   week or the patron who comes there periodically
24   to buy groceries?

Page 79

1    A.     Both.
2    Q.     Who would you expect to have the better
3    knowledge?
4    A.     The manager.
5    Q.     Because they're there more often?
6    A.     Yes.
7    Q.     And that's their job, correct?
8    A.     Yes.
9    Q.     And if I ask you about crosshatching or
10   things like that, you would give me the same
11   response, wouldn't you?
12   A.     Yes.
13   Q.     You probably won't know any of this, so
14   let's try to knock this out. Mr. Rudstrom has
15   been kind enough to provide me a video of a
16   surveillance camera out front, and he's given
17   me that, but are you aware of any other
18   evidence, that might be photo or video evidence
19   of the parking lot area where Ms. Brooks had
20   her accident?
21   A.     No.
22   Q.     You are unaware of any photos; is that
23   correct?
24   A.     No.

Page 80

1    Q.     There are no photos, that you're aware
2    of, that depict the accident area?
3    A.     No.
4    Q.     What about statements from any
5    witnesses, do you know of any? I showed you
6    one a minute go.  Do you know of any other,
7    other than Mr. Vogel that is attached to the
8    discovery?
9    A.     No.
10   Q.     What or who is Kevin Morgan; do you
11   know him?
12   A.     He was one -- he used to be one of the
13   managers there.
14   Q.     Is he still with Kroger?
15   A.     I don't think so.
16   Q.     What about Michael Pointer?
17   A.     He's one of the managers there as well.
18   Q.     Is he still with Kroger?
19   A.     I think so.
20   Q.     Do you know how to reach Kevin Morgan?
21   A.     No.
22   Q.     Would Kroger have information on his
23   last known address?
24   A.     Probably.

Page 81

1    Q.     Do you know when he left Kroger?
2    A.     No.
3    Q.     Do you know why he left Kroger?
4    A.     No.
5    Q.     Would you know him if you saw him?
6    A.     Yes.
7    Q.     So you knew him reasonably well?
8    A.     I see him around.
9    Q.     Do you know how long he was with
10   Kroger?
11   A.     No.
12   Q.     Are you aware of any other incidents in
13   the parking lot involving pedestrians and
14   vehicles at the store out there on Winchester?
15   A.     No.
16   Q.     Is there any reason why -- are you in
17   the loop for that kind of thing any way?
18   A.     No.
19   Q.     So you wouldn't expect to know if there
20   was any other incident?
21   A.     Yes.
22   Q.     And there is also a Ms. Brown at that
23   facility; does that ring a bell?
24   A.     No.

Page 82

1   Q.      I'll spell the first name Yoshamira,
2   Y O S H A M I R A, Brown?
3   A.      No.
4   Q.      Do you know what Mr. Pointer may or may
5   not know about what happened to Ms. Brooks; do
6   you know what he would know?
7   A.      Would I know?
8   Q.      Do you know what he knows or doesn't
9   know about this accident?
10  A.      No.
11  Q.      And to make it clear, I asked Kroger
12  who knows about this accident, and those are
13  names I got back, and I am trying to find out
14  if you know what they know?
15  A.      No.
16  Q.      Is there a form for patrons to fill out
17  if they have a complaint about a store?
18  A.      There is a customer comments.
19  Q.      Are those kept?
20  A.      I don't know.
21  Q.      Are those customer comments reviewed by
22  some sort of employee of Kroger?
23  A.      The manager.
24  Q.      Are they taken seriously?

Page 83

1   A.      Yes.
2   Q.      But those aren't the kind of thing that
3   would make their way to your department, are
4   they?
5   A.      No.
6   Q.      Do you know if they go to some higher
7   level after the manager looks at them?
8   A.      I don't know.
9   Q.      When you were a manager, did you review
10  the customer comments?
11  A.      Yes.
12  Q.      When you were at other stores, did you
13  have customer comments regarding the parking
14  lot including the crosswalk areas?
15  A.      No.
16  Q.      When you're trying to define the
17  approach to the store, what area do you
18  consider to be the approach to your store, if
19  you understand what I'm trying to get at?
20  A.      The path someone would take coming up
21  to the store.
22  Q.      That's part of it.  Use the path,
23  that's the best way?
24  A.      This area right here in front of the

Page 84

1   entrance door.
2   Q.      And the exit door I take it?
3   A.      Yes.
4   Q.      But they're not the same, are they?
5   A.      No.
6   Q.      They're reasonably close?
7   A.      They're next to each other.
8   Q.      But they're big sliding doors, right?
9   A.      Yes.
10  Q.      Estimate, if you would, how wide that
11  area is, if you can?
12  A.      I can't.   I would say maybe 16 feet
13  wide.
14  Q.      And is the area around either side of
15  that, which you would regard as the general
16  approach area to the store?
17  A.      Yes, there is a walkway.
18  Q.      In other words you would expect your
19  store patrons wouldn't always park necessarily
20  dead center of the doors; is that correct?
21  A.      No.
22  Q.      Some people would come to somewhat of
23  an angle to get to the front doors; is that
24  correct?

Page 85

1   A.      Yes.
2   Q.      That whole area in front there, as you
3   approach the door, you consider that to be the
4   approach to your store and you expect those
5   people to be your patrons?
6   A.      Yes.
7   Q.      Do you have those pictures here?
8           MR. RUDSTROM:  Yes.
9           MR. HALE:  May I look at them.
10          MR. RUDSTROM:  The witness has
11  never seen them, and we'll go off the record.
12          (Off the record discussion.)
13  BY MR. HALE:
14  Q.      Mr. Middleton, I have in front of you
15  five photographs that Mr. Rudstrom was kind
16  enough to bring to us, and actually they're
17  four photographs.  Do they at least appear to
18  be the Kroger store we've been discussing?
19  A.      Yes.
20  Q.      And although I recognize that the
21  quality of these reproductions aren't great,
22  does it appear that they were taken on January
23  9th, '08?
24  A.      Uh-huh.

Page 86

1   Q.   And that's 20 days from December 21st,
2   '07?
3   A.   Yeah.
4   Q.   A couple weeks or so after when Ms.
5   Brooks was injured; is that fair?
6   A.   Yes.
7   Q.   When looking at these, do you see a
8   crosswalk?
9   A.   No.
10   Q.   Do you see a stop sign?
11   A.   No.
12   Q.   Speed bumps?
13   A.   No.
14   Q.   Or crosshatching out into the area of
15   the walkway?
16   A.   No.
17       MR. HALE:  Let's make these the
18   next collective exhibit which would be three.
19     (Whereupon, Exhibit 3 was marked as an
20   exhibit to the deposition of the witness and
21   can be found among the deposition exhibits
22   attached hereto.)
23   BY MR. HALE:
24   Q.   Mr. Middleton, I have handed you

Page 87

1   another photograph that Mr. Rudstrom was kind
2   enough to provide us today.   Does that appear
3   to be the same Kroger store we've been talking
4   about out there on Winchester?
5   A.   Yes.
6   Q.   In particular you see what appears to
7   be a signature of Michael Pointer; is that
8   correct?
9   A.   Yes.
10   Q.   He's currently the Kroger manager or
11   co-manager?
12   A.   I think so.
13   Q.   You knew at one time he was?
14   A.   Yes.
15   Q.   And looks like this was dated 12-26-07;
16   is that correct?
17   A.   Yes.
18   Q.   We may have to ask Mr. Pointer to be
19   certain, but does it appear to you that's
20   probably the day he took those photographers?
21   A.   Yes.
22   Q.   That's less than a week after Ms.
23   Brooks' incident?
24   A.   Yes.

Page 88

1   Q.   If her injury happened to the December
2   21st, '07?
3   A.   Yes.
4   Q.   In these photographs do you see a
5   crosswalk?
6   A.   No.
7   Q.   A stop sign?
8   A.   No.
9   Q.   Speed bump?
10   A.   No.
11   Q.   Crosshatching in the roadway?
12   A.   No.
13   Q.   Now, assuming that Mr. Pointer, the
14   manager or co-manager of one of these Kroger
15   stores is correct, he has marked on this
16   picture a spot by an asterisk where apparently
17   he believes anyway Ms. Brooks was lying; does
18   that appear to be what he's written there?
19   A.   Yes.
20   Q.   Assuming that's in fact where the
21   accident occurred, and seeing where the front
22   doors are, is it fair to say that she was in
23   the area of the approach to the store?
24   A.   Approach or leaving the store, yes.

Page 89

1   Q.   Either way she was in the area?
2   A.   Yes.
3       MR. HALE:  Let's make that the
4   next exhibit.
5     (Whereupon, Exhibit 4 was marked as an
6   exhibit to the deposition of the witness and
7   can be found among the deposition exhibits
8   attached hereto.)
9   BY MR. HALE:
10   Q.   Collective Exhibit 4, three and four,
11   are these photographs that you have looked at,
12   they don't depict anything different than what
13   you saw when you went to the store in '08; is
14   that correct, as far as the crosswalk hatching
15   and all of that stuff?
16   A.   Yeah.
17   Q.   You believe what you would have seen,
18   when you walked out there, is similar to what
19   is in these pictures that Mr. Pointer took?
20   A.   Yes.
21   Q.   You don't know of any statements that
22   were given by anybody other than the one I
23   showed you today, which you haven't read, of
24   Mr. Vogel; you don't know of any other

Page 90

1  statements that anybody gave about this
2  accident, do you?
3  A.    No.
4  Q.    And do you know of anybody who was a
5  witness to what happened out there?
6  A.    No.
7  Q.    Have you entered into a lease for a new
8  Kroger facility since Ms. Brooks was injured
9  out there in December, 2007, at the Kroger
10  store on Winchester?
11  A.    No.
12  Q.    Do you have any new stores in your area
13  of responsibility since then?
14  A.    No.
15  Q.    Or any lease renewals?
16  A.    Lease renewals are automatic.
17  Q.    And I don't mean just that store?
18  A.    I understand.
19  Q.    Who at the Kroger is responsible for,
20  if there is somebody, keeping up with sort of
21  crime issues in and around their store?
22  A.    Risk management.
23  Q.    Would that, again, be the lady we
24  discussed earlier?

Page 91

1  A.    I don't know.
2  Q.    Is that her department any way?
3  A.    Yes.
4  Q.    Do you know whether this store out on
5  Winchester has similar or less or greater crime
6  problem than any other Kroger store?
7  A.    I don't know.
8  Q.    What about the parking lot in general,
9  just from your knowledge of the area of town,
10  do you know whether that parking lot has a
11  crime issue?
12  A.    No.
13  Q.    You just don't know?
14  A.    I don't know.
15  Q.    You don't know whether that store has
16  been sued by anybody else for any sort of
17  injuries in the parking lot?
18  A.    No.
19  Q.    That's just not your area of expertise
20  at Kroger?
21  A.    No, it's not.
22  Q.    Do you know whether anybody from Kroger
23  ever talked to Ms. Brooks, my client?
24  A.    No.   I don't know.

Page 92

1  Q.    I'm not saying they did or didn't, I'm
2  just asking if you know whether anybody did?
3  A.    I done know.
4  Q.    No one has related to you a
5  conversation that a Kroger employee might have
6  had with Ms. Brooks?
7  A.    No.
8  Q.    Or for that reason the driver of the
9  pickup truck that hit Ms. Brooks?
10  A.    No.
11  Q.    Is there any other document, that you
12  know about, that could in any way touch on the
13  occurrence that occurred out there or Kroger's
14  obligation or Kroger's regular pattern and
15  practice of dealing with the parking lot?
16  A.    No.
17  Q.    Have we talked about every document
18  that you are aware of?
19  A.    Yes.
20  Q.    Is there anything we have left out,
21  that you know of?
22  A.    No.
23  Q.    Have you understood all of the
24  questions?

Page

1  A.    Yes.
2  Q.    Do you have any qualms about any of the
3  answers that you have given me, and are you
4  comfortable with the answers you have given and
5  told me?
6  A.    Yes.
7       MR. HALE:   That's all I have.
8          CROSS EXAMINATION
9  BY MR. FEIGELSON:
10  Q.    My name is Dave Feigelson, and we met
11  for the first time this morning.   I represent
12  one of the defendants an entity known as Inland
13  Western Memphis Winchester LLC, and during the
14  course of Mr. Hale's questioning both you and
15  he referred to an entity by the name of Inland
16  without further specification.  When you
17  referred to Inland in answering Mr. Hale's
18  questions, were you referring to the entity
19  known as Inland Western Memphis Winchester LLC?
20  A.    Yes.
21  Q.    And in fact -- who is it that you
22  understand Inland Western Memphis Winchester,
23  LLC to be?
24  A.    The shopping center owner.

Page 94

1  Q.    Unless I specify otherwise, I'll
2  continue the same thought when I refer to
3  Inland Western Memphis LLC, all right?
4  A.    Yes.
5  Q.    You mentioned, during the course of
6  your testimony, if there is a repair or
7  maintenance issue or improvement issue to a
8  piece of real estate where a Kroger store is
9  located, where Kroger does not own the real
10 estate outside of the store itself, that the
11 usual way of making the landlord aware of any
12 improvements or maintenance or repairs that
13 need to be made to that property it will flow
14 from the store, the individual store to your
15 office to Inland, correct?
16 A.    Yes.
17 Q.    Did your office deal with the -- to
18 your knowledge, how many store locations does
19 Kroger lease from Inland currently?
20 A.    I think just this one location in this
21 division.
22 Q.    To your knowledge has your office
23 communicated with any other entity concerning
24 maintenance, repair or improvement issues to

Page 95

1  this property other than the entity we've been
2  referring to as Inland?
3  A.    No.
4       MR. RUDSTROM:  Do I assume you to
5  mean since Inland has had possession of the
6  property?
7  BY MR. FEIGELSON:
8  Q.    Since Inland has become the owner of
9  the property?
10 A.    No.
11 Q.    Has Kroger, and based on the answer to
12 my question, your office ever notified Inland
13 Western Memphis Winchester LLC of any defective
14 or dangerous conditions in the parking lot at
15 this store, and I know you mentioned the light
16 by the Wendy's and mentioned the pothole in the
17 back and the roof, but I'm talking in the
18 parking lot at this store that concerns the
19 safety of pedestrians or patrons for this
20 store?
21 A.    Can you repeat that.
22 Q.    I'll try.  Concerning this store that
23 we've been talking about today, where this
24 incident occurred on 12-21-07, has Kroger, your

Page 96

1  office ever notified Inland Western Memphis
2  Winchester of any defective or dangerous
3  conditions, other than the conditions you
4  mentioned to Mr. Hale earlier, that would
5  concern the safety of pedestrians or patrons in
6  this parking lot?
7  A.    I don't know.
8  Q.    You're not aware of any others, other
9  than the ones you mentioned to Mr. Hale?
10 A.    I'm not aware.
11 Q.    And the same question that Mr. Hale was
12 asking in terms of the speed bumps?
13 A.    I don't know.
14 Q.    Traffic conditions?
15 A.    I don't know.
16 Q.    Lighting, other than the one light you
17 already mentioned?
18 A.    I don't know.
19 Q.    Bushes or hedges?
20 A.    I don't know.
21 Q.    Signage?
22 A.    I don't know.
23 Q.    And parking lot marking like striping
24 or painting?

Page 97

1  A.    I don't know.
2  Q.    And crosswalks?
3  A.    I don't know.
4  Q.    I just need to know that you don't
5  know.  On Kroger's answers to the
6  interrogatories and request for production of
7  documents, there was an attachment.  I want
8  to show you a drawing of what we understand to
9  be the Kroger store and the shopping center and
10 the parking lot between County Gate Road and
11 Hacks Cross Road and fronting Winchester Road;
12 do you recognize that to be a drawing for this
13 store that we talked about?
14 A.    Yes.
15 Q.    The light near Wendy's and the fuel
16 center, can you point on there on this drawing
17 where the fuel center is?
18 A.    I think it's in this area.
19 Q.    Would you draw a box or a mark
20 indicating where you think the fuel center for
21 this shopping center is, the Kroger fuel
22 center?
23 A.    Right here.
24 Q.    Okay, if you will just put your name on

25 (Pages 94 to 97)

Page 98

1    here.   So, the fuel center, other than what
2    you have marked, the fuel center is not
3    depicted on this drawing as it was presented to
4    you, right?
5    A.    No.
6          MR. FEIGELSON:  If we could mark
7    that as Exhibit 5.
8          (Whereupon, Exhibit 5 was marked as an
9    exhibit to the deposition of the witness and
10   can be found among the deposition exhibits
11   attached hereto.)
12   BY MR. FEIGELSON:
13   Q.    Are you familiar with an entity by the
14   name of Inland U.S. Management LLC?
15   A.    I think so.
16   Q.    How are you familiar with that name?
17   A.    Is that the property management side of
18   Inland?
19   Q.    I can't answer?
20   A.    I think it's the property management
21   side of Inland.
22   Q.    To your knowledge has your office ever
23   communicated with Inland U.S. Management U.S.C.
24   about this property?

Page 99

1    A.    I don't know.
2    Q.    Other than from Kroger employees at
3    their store, do you know if your office has
4    ever received complaints from any customers or
5    visitors about this store?
6    A.    No.
7    Q.    To your knowledge has there ever been a
8    pedestrian vehicle accident in the parking lot
9    at this store while Kroger was a tenant?
10   A.    I don't know.
11   Q.    You mentioned during your testimony
12   answering Mr. Hale's questions that the store
13   managers, and I can't remember if it was Kroger
14   in general or this store in particular, that
15   the store managers perform what you termed a
16   store walk?
17   A.    Yes.
18   Q.    Can you explain a little bit more what
19   a store walk is for a manager?
20   A.    The check list looking at every item in
21   the check list and checking if it's okay or
22   needs attention.
23   Q.    And you said they perform the store
24   walk. I don't know if I got the words right,

Page 100

1    from the time they arrive to when they get out
2    of their car?
3    A.    Yes.
4    Q.    Do they have a special area where they
5    park or whatever is available?
6    A.    I think so, yes.
7    Q.    At this location?
8    A.    Yes, yes.
9    Q.    Can you show us on what's been
10   identified as Exhibit 5 where the store
11   managers are supposed to park?
12   A.    I believe it's here in this area.
13   Q.    You're pointing to the west of the
14   Kroger store, correct?
15   A.    Yes.
16   Q.    If you could make that a little more
17   clear on there?
18   A.    (Indicating).
19   Q.    All right.  You've drawn a rectangle
20   there to the west of the store, and do they
21   perform this store walk inspection for the
22   entire parking lot or just wherever they walk
23   from where they park to entering the store?
24   A.    I don't know.

Page 10

1    Q.    Do they perform the store walk on
2    arrival or when they are leaving also?
3    A.    Upon arrival.
4    Q.    Only on arrival?
5    A.    Only on arrival.
6    Q.    Do you know how many managerial shifts
7    there would have been at this store December
8    21, 2007, in other words, is it eight hours,
9    eight to four, four to 12 or whatever it might
10   be?
11   A.    Two, eight to six and twelve to ten or
12   one to eleven.
13   Q.    Eight to six and 12 to --
14   A.    (Interposing.) Ten.
15   Q.    So they overlap somewhat?
16   A.    Yes, yes.
17   Q.    About six hours?
18   A.    Yes.
19   Q.    So, from what you're telling us one
20   begins at eight a.m. and one begins at noon,
21   and a manager would not arrive at nighttime
22   after the sun went down; is that correct?
23   A.    No.
24   Q.    Am I correct?

**Page 102**

1  A.   Yes.
2  Q.   No Kroger store manager would perform a
3  store walk after dark?
4  A.   No.
5  Q.   I'm correct?
6  A.   Yes, you're correct.
7  Q.   You mentioned that the last time you
8  were at this particular Kroger location was in
9  the spring of '08, correct?
10  A.   January or February, 2008.
11  Q.   Prior to January February '08, how
12  often did you visit this particular store?
13  A.   Not often.
14  Q.   Less than ten times?
15  A.   Yes, less than two times.
16  Q.   As in one?
17  A.   Yes, once maybe.
18  Q.   Do you recall when that was?
19  A.   No.
20  Q.   You had mentioned that you shopped
21  there before?
22  A.   Yeah, I shopped there before because I
23  was in that area.
24  Q.   Those are the visits I'm referring to,

**Page 103**

1  not part of your duties as Kroger's real estate
2  person, but in terms of how often you visited
3  this person to shop other than that January
4  February '08 visit?
5  A.   I would say maybe two other times
6  outside of that one time.
7  Q.   All right.  Do you recall when they
8  were?
9  A.   No.
10  Q.   How long before the January, '08, visit
11  was your last visit if you recall?
12  A.   Maybe a year.
13  Q.   You don't live in that area?
14  A.   No.
15  Q.   I believe you answered Mr. Hale, you've
16  never been to this location at night, correct?
17  A.   Correct.
18  Q.   Do you know who Ms. York communicates
19  with when she communicates with Inland Western
20  Memphis Winchester LLC?
21  A.   Maggie Dean.
22  Q.   Have you ever communicated with Maggie
23  Dean about this particular location?
24  A.   No.

**Page 104**

1  Q.   Have you ever met her?
2  A.   No.
3  Q.   Did Ms. York make written memoranda or
4  notes about her communications with Inland?
5  A.   It depends on what it pertains to.
6  Q.   All right.  On what occasions would
7  she make written notes or memoranda concerning
8  her communications with Inland?
9  A.   Maintenance issues.
10  Q.   All right.  Have you ever reviewed
11  those notes or memoranda?
12  A.   For this store?
13  Q.   Yes.
14  A.   Yes.
15  Q.   Is that part of your routine practice
16  once a week or once a month for you to review
17  memoranda, or does she cc you copies that you
18  see on a regular basis?
19  A.   No.
20  Q.   How is it that you would come to review
21  her written notes and memoranda?
22  A.   If it's an ongoing issue, ongoing
23  maintenance issue.
24  Q.   So, for example, if Ms. York were to

**Page 105**

1  call Ms. Dean and say we need X done at this
2  parking lot and Ms. Dean says, okay, we'll do
3  it and a month later it's not done, it would
4  come to your attention?
5  A.   Yes.
6  Q.   Did you review any notes or memoranda,
7  in whatever form, from Ms. York in preparing
8  for your deposition today?
9  A.   I did look at the maintenance log.
10  Q.   Is that what you were referring to when
11  you were talking to Mr. Hale?
12  A.   Yes.
13  Q.   Is that it?
14  A.   Yes.
15  Q.   Where is your office located?
16  A.   800 Ridgelake Boulevard.
17  Q.   Here in Memphis?
18  A.   Yes.
19  Q.   And Ms. York is physically in your
20  office?
21  A.   Yes.
22  Q.   And that maintenance log is going to
23  have the lights out by Wendy's in it?
24  A.   Yes.

27 (Pages 102 to 105)

Page 106

1  Q.     Do you know what time period that
2  covers?
3  A.     I believe it started in 2005 up until
4  the present date.
5  Q.     2005 to date?
6  A.     Yes.
7  Q.     When Mr. Hale was asking you about stop
8  signs and such, and if Kroger -- there was a
9  whole discussion about whether or not Kroger
10 could, regardless of what the lease says, go
11 ahead and put a stop sign or crosswalk in, do
12 you remember that discussion?
13 A.     Yes.
14 Q.     I'm not using the right words, and I
15 apologize if I'm repeating myself, but to your
16 knowledge your office has never asked Inland
17 Western Memphis Winchester LLC to install a
18 crosswalk or speed bumps or crosshatching at
19 this facility, correct?
20 A.     Correct.
21 Q.     Let me show you what was admitted as
22 Exhibit 4, the photos Mr. Pointer has signed.
23 Again, I'm asking only if you know.   I don't
24 want you to guess?

Page 107

1  A.     Okay.
2  Q.     You can estimate, but I'm not asking
3  you to guess.   Looking at the top photograph,
4  you see where the what appears to be a hedge in
5  front of the white pickup is?
6  A.     Yes.
7  Q.     Do you see that in the photograph?
8  A.     Yes.
9  Q.     As you're looking at the photograph to
10 the left, there appears to be a grass median,
11 correct?
12 A.     Yes.
13 Q.     Okay.   From where the grass median on
14 the photograph meets the hedge, the left side
15 of the hedge, which I think we all understand
16 is going to be the east side of the hedge,
17 correct?
18 A.     Yes.
19 Q.     All right.   There is two yellow posts
20 that appear to be the same height as the hedge,
21 correct?
22 A.     Yes.
23 Q.     Do you know what those posts are for?
24 A.     No.

Page 108

1  Q.     Can you estimate the distance from the
2  place at the curb that's depicted there where
3  the hedge meets the grass; do you see where I'm
4  referring to?
5  A.     Yes.
6  Q.     The distance from the curb along that
7  white line that's painted there, in that
8  direction to the center line of the roadway,
9  can you make an estimate based on your
10 knowledge of how far that is?
11 A.     No.
12 Q.     Can you make an estimate again based on
13 your knowledge looking at the photograph at the
14 bottom of the page on a straight line from the
15 center line to what appears to be the entrance
16 door; do you see that?
17 A.     Yes.
18 Q.     Can you estimate how far it is from
19 that center line to the curb in front of the
20 entrance door?
21 A.     Can you repeat that.
22 Q.     Yeah.  Can you provide us with an
23 estimate, based on your own knowledge, of how
24 far it is from the curb directly in front of

Page 109

1  the entrance door to the center line in the
2  roadway that's depicted in this photograph?
3  A.     Three feet.
4           MR. HALE:  I don't think he
5  understands the question.
6           MR. FEIGELSON:  Let me --
7           MR. RUDSTROM:  Maybe refer to it
8  as a double yellow line.
9  BY MR. FEIGELSON:
10 Q.     Do you see the entranceway to the
11 store.  I appreciate counsel helping me.   It
12 appears to be a sidewalk in front of the
13 entrance door, correct?
14 A.     Yes.
15 Q.     And there appears to be a curb coming
16 towards me?
17 A.     Yes.
18 Q.     From that curb in front of the
19 entranceway to what appears to be a double line
20 in the roadway in front of the store?
21 A.     Uh-huh.
22 Q.     It appears to be a double line in the
23 center of the roadway, correct?
24 A.     Yes.

Page 110

1  Q.   This double line I'm pointing to?
2  A.   Yes.
3  Q.   Can you provide us with an estimate of
4  how far it is from the edge of the curb to the
5  double line that appears to be in the center of
6  the roadway?
7      MR. RUDSTROM:  I'll remind you
8  that he asked you not to guess.
9  BY MR. FEIGELSON:
10 Q.   And I also asked you based on your
11 knowledge?
12 A.   I don't know.
13 Q.   That's a good answer.  That's fine,
14 thank you.
15     Do you have any knowledge of anything
16 Inland Western Memphis Winchester LLC did or
17 didn't do to cause or contribute to the cause
18 of Ms. Brooks being struck by a vehicle in this
19 parking lot?
20 A.   No.
21 Q.   Do you know if anyone in your office
22 would have any such knowledge?
23 A.   No.
24     MR. FEIGELSON:  Nothing further.

Page 111

1      REDIRECT EXAMINATION
2  BY MR. HALE:
3  Q.   I have a couple quick follow-ups.
4  Just to help you, you were asked again by Mr.
5  Feigelson about those posts and what they're
6  for.  Let me show you another picture that I
7  believe depicts the posts and looks like it's a
8  handicapped sign; is that what that is?
9  A.   Yes.
10 Q.   You think on the top of the posts that
11 are depicted in Exhibit 4, there is a
12 handicapped sign; it's just out of view?
13     MR. RUDSTROM:  Are you asking him
14 whether the handicapped sign is on top of the
15 post?
16 BY MR. HALE:
17 Q.   It appears that's the handicapped sign
18 which we can't see because it's cut off in the
19 picture; is that right?
20 A.   Looks like it.
21 Q.   Okay.  Okay, and one more question.
22 The drawing that's now Exhibit 5 that depicts
23 the property, does it appear that that drawing
24 at or near the front doors of the Kroger

Page 112

1  facilities at Winchester and across the roadway
2  there is a drawing that depicts there is
3  suppose to be crosswalks?
4      MR. FEIGELSON:  Objection.
5      THE WITNESS:  I don't know.
6  BY MR. HALE:
7  Q.   Let me ask it this way.  Does it appear
8  there are two dark lines drawn across what
9  would be the path of the traveled roadway to
10 the area that would be very near to the exit
11 and entrance to the Kroger facility?
12 A.   Could you repeat that.
13 Q.   I'm asking whether there are two dark
14 lines drawn across the roadway directly across
15 from the exit and entranceway to the Kroger
16 store, and I'll point to it, does the diagram
17 depict two dark lines across the roadway?
18 A.   I see a line.  I don't see a second
19 line, but there is a line.
20 Q.   Okay, and two of them, one here and two
21 of them right in front of the entrance and the
22 exit to the facility; is that right?
23 A.   Yes.
24     MR. HALE:  Okay, that's all I

Page 113

1  have got.  I have no more questions.
2      MR. RUDSTROM:  I have no
3  questions.
4
5      (Signature waived)
6
7  AND FURTHER THE DEPONENT SAITH NOT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 114

```
 1              C E R T I F I C A T E
 2   STATE OF TENNESSEE )
 3   COUNTY OF SHELBY  .)
 4
        I, AMY DILLINGER, CSR, RPR, a Notary Public in
 5   and for the said state and county, hereby
     certify that the foregoing deposition was taken
 6   before me at the time and place specified in
     the caption hereof, and the said witness was
 7   first duly sworn by me.
        I further certify that the testimony of said
 8   witness was taken down in stenograph by myself
     and thereafter transcribed and reduced to
 9   typewriting under my direction, and constitutes
     a full, true and correct record of the
10   foregoing deposition.
        I further certify that I am not agent,
11   attorney or counsel for any of the parties, and
     that I am in no way interested in the event of
12   the cause named in said caption.
        IN WITNESS WHEREOF, I have hereunto set my
13   hand and official seal this        day of
     October, 2009.
14
15   _____
            AMY DILLINGER, CSR, RPR
16          NOTARY PUBLIC AT LARGE
     MY COMMISSION EXPIRES: January 12, 2010.
17
18
19
20
21
22
23
24
```

**ACORD** CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
11/26/2007

| PRODUCER | |
|---|---|
| Aon Risk Services, Inc. of Illinois<br>200 East Randolph<br>Chicago IL 60601 USA<br><br>PHONE (866) 283-7122    FAX (847) 953-5390 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: American Home Assurance Co. | 19380 |
| INSURER B: Illinois National Insurance Co | 23817 |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

INSURED
Inland Western Retail
Real Estate Trust, Inc.
2901 Butterfield Road
Oak Brook IL 60523 USA

Holder Identifier: Western

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS MADE [X] OCCUR<br>[X] XCU Included<br><br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>[ ] POLICY [X] PRO-JECT [X] LOC | | 10/01/07 | 12/01/08 | EACH OCCURRENCE<br>DAMAGE TO RENTED PREMISES (Ea occurrence)<br>MED EXP (Any one person)<br>PERSONAL & ADV INJURY<br>GENERAL AGGREGATE<br>PRODUCTS - COMP/OP AGG | |
| | | **AUTOMOBILE LIABILITY**<br>[ ] ANY AUTO<br>[ ] ALL OWNED AUTOS<br>[ ] SCHEDULED AUTOS<br>[ ] HIRED AUTOS<br>[ ] NON OWNED AUTOS | | | | COMBINED SINGLE LIMIT (Ea accident)<br>BODILY INJURY (Per person)<br>BODILY INJURY (Per accident)<br>PROPERTY DAMAGE (Per accident) | |
| | | **GARAGE LIABILITY**<br>[ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT<br>OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | |
| B | | **EXCESS / UMBRELLA LIABILITY**<br>[X] OCCUR [ ] CLAIMS MADE<br>[ ] DEDUCTIBLE<br>[X] RETENTION | BE6564926 | 10/01/07 | 12/01/08 | EACH OCCURRENCE<br>AGGREGATE | |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR / PARTNER / EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | | | | [ ] WC STATU-TORY LIMITS [ ] OTHER<br>E.L. EACH ACCIDENT<br>E.L. DISEASE-EA EMPLOYEE<br>E.L. DISEASE-POLICY LIMIT | |
| | | OTHER | | | | | |

Certificate No: 5700...

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS
RE: Kroger Store #437 - Winchester Commons, Memphis, TN 38125 . Named insured includes: Inland Western Memphis Winchester, L.L.C., a delaware limited liability company. The Kroger Co. (and Kroger's affiliates and subsidiaries) is included as additional insured solely with respect to general liability coverage as required by

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Kroger Limited Partnership 1<br>Attn: Real Estate<br>P.O. Box 1878<br>Memphis TN 38101-1878 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br><br>AUTHORIZED REPRESENTATIVE |

EXHIBIT
D

**ACORD™** CERTIFICATE OF LIABILITY INSURANCE

| | DATE(MM/DD/YYYY) 10/18/2007 |
|---|---|

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

PRODUCER
Aon Risk Services, Inc. of Illinois
200 East Randolph
Chicago IL 60601 USA

PHONE-(866) 283-7122    FAX-(847) 953-5390

| INSURERS AFFORDING COVERAGE | NAIC# |
|---|---|
| INSURER A: American Home Assurance Co. | 19380 |
| INSURER B: AIG Excess Liability Insurance Co. Ltd. | 10932 |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

INSURED
Inland Western Retail
Real Estate Trust, Inc.
2901 Butterfield Road
Oak Brook IL 60523 USA

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YY) | POLICY EXPIRATION DATE(MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY [X] COMMERCIAL GENERAL LIABILITY CLAIMS MADE [X] OCCUR [X] XCU Included | | 10/01/07 | 12/01/08 | EACH OCCURRENCE | ▓ |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | |
| | | | | | | MED EXP (Any one person) | |
| | | | | | | PERSONAL & ADV INJURY | |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: [ ] POLICY [X] PRO-JECT [X] LOC | | | | GENERAL AGGREGATE | ▓ |
| | | | | | | PRODUCTS - COMP/OP AGG | ▓ |
| | | AUTOMOBILE LIABILITY [ ] ANY AUTO [ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS [ ] HIRED AUTOS [ ] NON OWNED AUTOS | | | | COMBINED SINGLE LIMIT (Ea accident) | |
| | | | | | | BODILY INJURY (Per person) | |
| | | | | | | BODILY INJURY (Per accident) | |
| | | | | | | PROPERTY DAMAGE (Per accident) | |
| | | GARAGE LIABILITY [ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | |
| | | | | | | OTHER THAN EA ACC AUTO ONLY: AGG | |
| B | | EXCESS / UMBRELLA LIABILITY [X] OCCUR [ ] CLAIMS MADE [ ] DEDUCTIBLE [X] RETENTION ▓ | 8E6564926 | 10/01/07 | 12/01/08 | EACH OCCURRENCE | ▓ |
| | | | | | | AGGREGATE | ▓ |
| | | | | | | | |
| | | | | | | | |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR / PARTNER / EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | [ ] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | |
| | | | | | | E.L. DISEASE-EA EMPLOYEE | |
| | | | | | | E.L. DISEASE-POLICY LIMIT | |
| | | OTHER | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS
RE: Kroger Store #437-/Winchester Commons, Memphis, TN 38125 . Named insured includes: Inland Western Memphis winchester, L.L.C., a Delaware limited liability company. The Kroger Co. (and Kroger's affiliates and subsidiaries) is included as additional insured solely with respect to general liability coverage as required by

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Kroger Limited Partnership 1 Attn: Cindy Boland 2175 Parklake Drive Atlanta GA 30345 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

Holder Identifier: Western

Certificate No.: 570-



# SPICER, FLYNN & RUDSTROM, PLLC

ATTORNEYS AT LAW. EST. 1963

Kenneth R. Rudstrom
email: krr@sfrlaw.com
direct: 901.522.2303
www.sfrlaw.com

175 Toyota Plaza, Suite 800
Memphis, TN 38103
901.523.1333
fax: 901.526.0213

February 19, 2009



David Feigelson, Esq.
Petkoff and Feigelson
305 Washington Avenue
Memphis, TN 38103-1911

RE:     Claim No:      20071245480
        Client:        Kroger
        Adverse Party: Lillian Brooks & Anthony Brooks
        Our File No.:  0013.042340

Dear David:

As a follow-up to our last telephone conversation, please be advised that on behalf of my client, The Kroger Company, I am asking to tender the defense of Kroger to your client and Kroger's landlord, Inland Western Memphis Winchester, LLC, pursuant to the lease agreement between the parties. Please advise.

Very truly yours,

SPICER, FLYNN & RUDSTROM, PLLC

Rick Rudstrom

RR:nj
cc:    Michelle Walker

NASHVILLE
Bank of America Plaza
414 Union Street, Suite 1700
Nashville, TN 37219
615.259.9080
fax 615.259.1522

KNOXVILLE
800 South Gay Street
Suite 1400
Knoxville, TN 37929
865.673.8516
fax 865.673.8972

CHATTANOOGA
537 Market Street
Suite 203
Chattanooga, TN 37402
423.756.0262
fax 423.756.8489



**SR** SPICER RUDSTROM, PLLC

*Kenneth R. Rudstrom*
*email: krr@spicerfirm.com*
*direct: 901.522.2303*
*www.spicerfirm.com*

*175 Toyota Plaza, Suite 800*
*Memphis, TN 38103*
*901.533.1333*
*fax: 901.526.0213*

February 16, 2011

**P** PREMIER MEMBER

David Feigelson, Esq.
Petkoff and Feigelson
305 Washington Avenue
Memphis, TN 38103-1911

    RE:      Claim No:   20071245480
               Client:       Kroger
               Adverse Party: Lillian Brooks & Anthony Brooks
               Our File No.:  0013.042340

Dear Dave:

I wanted to advise you that my client, Kroger, was speaking directly with your client, their landlord, regarding the landlord's failure to assume Kroger's defense in this matter. I wanted you to be aware that this communication was going on between our respective clients.

It has come to my attention that Kroger is named as an additional insured on the policy of insurance affecting the property in question. Although I have been provided with a copy of the insurance policy and the declaration page, I am asking that you please provide me with a certified copy of this policy showing Kroger as an additional insured.

Also, Kroger is contemplating filing a separate lawsuit based on the lease agreement in this matter and then, at the appropriate time, consolidating the contract case with the tort case. I will keep you advised as to their decision. Should you have any questions please advise.

               Very truly yours,

               SPICER RUDSTROM, PLLC

               Rick Rudstrom

RR:nj
cc:   Janice Hayworth

**NASHVILLE**
*Bank of America Plaza*
*414 Union Street, Suite 1700*
*Nashville, TN 37219*
*615.259.9080*
*fax 615.259.1522*

**KNOXVILLE**
*800 South Gay Street*
*Suite 1100*
*Knoxville, TN 37929*
*865.673.8516*
*fax 865.673.8972*

**CHATTANOOGA**
*537 Market Street*
*Suite 203*
*Chattanooga, TN 37402*
*423.756.0262*
*fax 423.756.8489*



13.42340 Kle

LAW FIRM

PETKOFF AND FEIGELSON

WASHINGTON COURTYARD

DAVID I. FEIGELSON
dfeigelsou@pf-law.net

305 WASHINGTON AVENUE

MEMPHIS, TENNESSEE 38103-1911

Telephone: (901) 523-1050
Facsimile:  (901) 523-1061

February 25, 2011

RECEIVED
FEB 28 2011
Spicer, Flynn & Rudstrom
Attorneys at Law

**Via U.S. Mail**

Mr. Kenneth R. Rudstrom
SPICER RUDSTROM, PLLC
175 Toyota Plaza
Suite 800
Memphis, TN 38103

RE: *Lillian Brooks and Anthony Brooks v. Tuwayne Shivers*, et al.
Shelby County Circuit Court Docket No. CT-005835-08
Our File No.  13.8032

Dear Rick:

        We are in receipt of your February 16, 2011 correspondence in the
above-referenced litigation.  Kindly provide us with copies of those
portions of Inland Western's Insurance Policy which support Kroger's
claim that they are named as an additional insured on the Policy.  We
do not believe that Kroger is a named additional insured on the Policy
and, therefore, we are unable to provide you with a certified copy of
the Policy showing Kroger as an additional insured, per your request.

        Rick, thank you for your cooperation.

                                        Very truly yours,

                                        PETKOFF AND FEIGELSON

                                        David I. Feigelson

DIF:pm

F:\Apps\WPDATA\FILES\P & F FILES\FEIGELSON, D\13-8032\CORRESPONDENCE\LETTERS\COUNSEL\RUDSTROM5.wpd



**SR** | **SPICER RUDSTROM**, PLLC
ATTORNEYS AT LAW · EST. 1965

*Betty Ann Milligan*
email: bam@spicerfirm.com
direct: 901.522.2304
www.spicerfirm.com

175 Toyota Plaza, Suite 800
Memphis, TN 38103
901.523.1333
fax: 901.526.0213

March 1, 2011

David Feigelson, Esq.
305 Washington Avenue
Memphis, Tennessee 38103-1911

Re:    *Brooks v. Kroger and Inland Western*
Our File No.:  13.42340

Dear Dave:

Pursuant to your request, attached is the Certificate of Insurance for Inland Western Retail which was effective for a coverage period of October 1, 2007 to December 1, 2008. It clearly provides that Kroger Company and its affiliates are to be additional insureds. Obviously, this coverage afforded to my client was in effect on the date of the loss involving Ms. Brooks. Production of this certificate by Kroger should put to rest any questions your client may have as to whether or not they should be providing a defense and indemnification of Kroger in this matter.

Once again, as a follow-up to the prior letter you received from Rick Rudstrom, please produce a certified copy of the policy that was in effect during this period of time. We would like to have the opportunity to review it to analyze its coverage terms and conditions.

Please advise your client that Kroger fully intends to exercise all rights and remedies available to it in regard to the agreements it has with Inland Western. Thus, we look forward to receiving the certified copy of the policy at your earliest convenience. We would also appreciate hearing from your client concerning their position on their obligation to Kroger arising out of the lease and the insurance agreement.

I look forward to hearing from you in that regard.

**NASHVILLE**
*Bank of America Plaza*
*414 Union Street, Suite 1700*
*Nashville, TN 37219*
*615.259.9080*
*fax 615.259.1522*

**KNOXVILLE**
*800 South Gay Street*
*Suite 1400*
*Knoxville, TN 37929*
*865.673.8516*
*fax 865.673.8972*

**CHATTANOOGA**
*537 Market Street*
*Suite 20.3*
*Chattanooga, TN 37402*
*423.756.0262*
*fax 423.756.8489*



David Feigelson, Esq.
March 1, 2011
Page 2

Very truly yours,

SPICER RUDSTROM, PLLC

Betty Ann Milligan

BAM:sw
Encl.

2007124-4800001

# ACORD™ CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YY) 10/18/07

**PRODUCER**
Aon Risk Services, Inc. of Illinois
200 East Randolph
Chicago IL 60601 USA

PHONE: (866) 283-7122          FAX: (847) 953-5390

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**COMPANIES AFFORDING COVERAGE**

| COMPANY A | Lexington Insurance Company |
|---|---|
| COMPANY B | |
| COMPANY C | |
| COMPANY D | |

**INSURED**
Inland Western Retail
Real Estate Trust, Inc.
2901 Butterfield Road
Oak Brook IL 60523 USA

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | COVERED PROPERTY | | LIMITS |
|---|---|---|---|---|---|---|---|
| A | X  PROPERTY | 8756400 | 10/01/07 | 12/01/08 | BUILDING | | |
| | CAUSES OF LOSS | | | | PERSONAL PROPERTY | | |
| | BASIC | | | | BUSINESS INCOME | | |
| | BROAD | | | | EXTRA EXPENSE | | |
| | X  SPECIAL | | | | BLANKET BUILDING | X | Included |
| | EARTHQUAKE | | | | BLANKET PERS PROP | | |
| | FLOOD | | | | BLANKET BLDG & PP | | |
| | | | | | Loss Limit | X | $100,000,000 |
| | | | | | Deductible | X | $100,000 |
| | INLAND MARINE | | | | | | |
| | TYPE OF POLICY | | | | | | |
| | CAUSES OF LOSS | | | | | | |
| | NAMED PERILS | | | | | | |
| | OTHER | | | | | | |
| | CRIME | | | | | | |
| | TYPE OF POLICY | | | | | | |
| | BOILER & MACHINERY | | | | | | |
| | OTHER | | | | | | |

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

RE: Kroger Store #437- Winchester Commons, Memphis, TN 38125 .

SPECIAL CONDITIONS / OTHER COVERAGES

Named insured includes: Inland Western Memphis Winchester. L.L.C., a Delaware limited liability company. Waiver of subrogation applies.

**CERTIFICATE HOLDER**

Kroger Limited Partnership 1
Attn: Cindy Boland
2175 Parklake Drive
Atlanta GA 30345 USA

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF THE ISSUING COMPANY WILL ENDEAVOR TO MAIL 90 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE

ACORD 24 (1/95)          © ACORD CORPORATION 1995

**ACORD.** CERTIFICATE OF LIABILITY INSURANCE

| | DATE(MM/DD/YYYY) |
|---|---|
| | 11/26/2007 |

PRODUCER
Aon Risk Services, Inc. of Illinois
200 East Randolph
Chicago IL 60601 USA

PHONE (866) 283-7122        FAX (847) 953-5390

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

INSURERS AFFORDING COVERAGE

INSURED
Inland Western Retail
Real Estate Trust, Inc.
2901 Butterfield Road
Oak Brook IL 60523 USA

| | | NAIC # |
|---|---|---|
| INSURER A: | American Home Assurance Co. | |
| INSURER B: | Illinois National Insurance Co | 19380 |
| INSURER C: | | 23817 |
| INSURER D: | | |
| INSURER E: | | |

COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YY) | POLICY EXPIRATION DATE(MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY | GL4572271 | 10/01/07 | 12/01/08 | EACH OCCURRENCE | $1,000,000 |
| | | [X] COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $100,000 |
| | | [ ] CLAIMS MADE [X] OCCUR | | | | MED EXP (Any one person) | Excluded |
| | | [X] XCU Included | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | [ ] POLICY [X] PRO-JECT [X] LOC | | | | | |
| | | AUTOMOBILE LIABILITY | | | | COMBINED SINGLE LIMIT (Ea accident) | |
| | | [ ] ANY AUTO | | | | | |
| | | [ ] ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | |
| | | [ ] SCHEDULED AUTOS | | | | | |
| | | [ ] HIRED AUTOS | | | | BODILY INJURY (Per accident) | |
| | | [ ] NON OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | |
| | | GARAGE LIABILITY | | | | AUTO ONLY - EA ACCIDENT | |
| | | [ ] ANY AUTO | | | | OTHER THAN    EA ACC AUTO ONLY:        AGG | |
| B | | EXCESS/UMBRELLA LIABILITY | BE6564928 | 10/01/07 | 12/01/08 | EACH OCCURRENCE | $25,000,000 |
| | | [X] OCCUR [ ] CLAIMS MADE | | | | AGGREGATE | $25,000,000 |
| | | [ ] DEDUCTIBLE | | | | | |
| | | [X] RETENTION  $10,000 | | | | | |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | | | | [ ] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | | | E.L. EACH ACCIDENT | |
| | | If yes, describe under SPECIAL PROVISIONS below | | | | E.L. DISEASE-EA EMPLOYEE | |
| | | | | | | E.L. DISEASE-POLICY LIMIT | |
| | | OTHER | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS
RE: Kroger Store #437- Winchester Commons, Memphis, TN 38125   Named insured includes: Inland Western Memphis Winchester, L.L.C., a Delaware limited liability company.   The Kroger Co. (and Kroger's affiliates and subsidiaries) is included as additional insured solely with respect to general liability coverage as required by

CERTIFICATE HOLDER

Kroger Limited Partnership 1
Attn: Real Estate
P.O. Box 1878
Memphis TN 38101-1878 USA

CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE

ACORD 25 (2001/08)

ACORD CORPORATION 1988

**SPICER RUDSTROM**, PLLC

Betty Ann Milligan
email: bann@spicerfirm.com
direct: 901.522.2304
www.spicerfirm.com

175 Toyota Plaza, Suite 800
Memphis, TN 38103
901.523.1333
fax: 901.526.0213



June 1, 2011

David Feigelson, Esq.
Petkoff and Feigelson
305 Washington Avenue
Memphis, TN 38103-19111

   RE: *Brooks v. Kroger et al.*
     My File No.: 13.42340

Dear Dave:

  This correspondence is in follow-up to prior letters to you from Rick Rudstrom, specifically of February 16, 2011, and myself, specifically of March 1, 2011; concerning the relationship of your client, Inland Western, and our client, the Kroger Company, as it pertains to insurance coverage.  We have, in both letters, requested a certified copy of the policy of insurance of Inland Western regarding the property in question in this particular case.  To date, you have not honored that request.  Your client has continued to ignore its obligations to Kroger in regard to this claim.  Kroger even had to supply Inland Western with the Certificate of Insurance which clearly reflected that my client was an additional insured under the policy of insurance obtained by your client for this property.  Even after providing that Certificate, your client has been silent on the issue of assuming the defense of Kroger in this case and providing indemnification to it.  Obviously, your client is not acting in good faith in this situation.

  Please consider this correspondence notice to your client that the Kroger Company intends to pursue a Declaratory Judgment action against it to enforce the provisions, terms, and conditions of the policy of insurance within which Kroger has been named an additional insured. We will be seeking defense, indemnification, recovery of expenses to Kroger for the defense of this particular matter, as well as attorney's fees for pursuit of the Declaratory Judgment.  It is our position that your clients continued refusal to acknowledge its obligations to the Kroger Company constitutes bad faith.  This bad faith refusal to honor the terms of the contractual agreement between the parties is totally unacceptable and a clear violation of the applicable law.

  We regret that your client has placed us in an untenable position, but we fully intend to exercise our rights under the lease agreement with Inland Western as well as under its insurance policy naming Kroger as an additional insured to the fullest extent possible.  Please inform your client immediately concerning our position.



Very truly yours,

**SPICER RUDSTROM, PLLC**


Betty Ann Milligan

BAM/sw